**UNITED STATES of America, Plaintiff,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY; Western Electric Company, Inc.; and Bell Telephone Laboratories, Inc., Defendants.**

Civ. A. No. 74–1698.

United States District Court, District of Columbia.

Oct. 9, 1981.

Gerald A. Connell, U.S. Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Jim G. Kilpatric, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, George L. Saunders, Jr., Sidley & Austin, Washington, D. C., for defendants.

Stephen A. Sharp, Gen. Counsel, F. C. C., Washington, D. C., for F. C. C.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Defendants have stated that they are planning to call as witnesses several former and present officials and employees of the Federal Communications Commission and of the United States Department of Justice. The government has interposed objections based on relevancy and privilege and the FCC has adopted and submitted to the Court a formal resolution raising privilege claims.[1] Proffers have been submitted by the defendants and briefs have been filed by the various interested parties.

### I

It should be noted initially, that it is not easy to discern exactly what is embraced in defendants' proffer. On five occasions defendants have stated what they intend to ask the various new[2] witnesses; but with almost every proffer[3] the rationale for calling the witnesses and the substance of their proposed testimony changed drastically.[4] This uncertainty casts substantial doubt on the actual need of defendants for this evidence. That doubt is deepened by their failure to list most of the witnesses now sought to be called either in the pretrial period or during the first six months of the trial.[5] The almost inescapable conclusion to

1. The government's assertion of privilege is likewise supported by a formal claim (signed by Assistant Attorney General Baxter on behalf of the Attorney General).

2. Several FCC employees are not "new"; they were listed by defendants long ago, and their status is now in question only because the FCC has recently asserted privilege with respect to them. See *infra*.

3. Defendants filed a "Memorandum in Support of their Proposed Trial Schedule" on September 23, 1981, a "Proffer of Proof" on September 30, 1981, and a "Reply Memorandum" on the same date. Defendants' lead counsel has twice addressed himself to this question (Tr. 15899–909; 16394–97).

4. In their Memorandum submitted on September 23, defendants claimed that the former FCC Commissioners were to be questioned regarding the need to protect the telephone network from harm and on alternative ways of assuring the requisite protection; in their Reply Memorandum, filed September 30, they asserted that the Commissioners' appearance was required so that they might provide testimony bearing on the reasonableness of defendants' conduct following the *Carterfone* decision (13 F.C.C.2d 420 (1968)); and the gist of their "proffer," also filed on September 30, is that the Commission-

ers need to give evidence regarding their alleged understanding that *Carterfone* dealt only with the attachment of devices to the existing network (as distinguished from the replacement of part of that network). Finally, although defendants stated to the Court orally that the FCC Commissioners had to be called to refute the government's contention that the Commissioners were ineffective as regulators (Tr. 15906), neither of defendants' written memoranda addresses this point.

5. Under the agreements accompanying the stipulation packages—which have been adopted by the Court—new witnesses were to be added only upon a showing of "good cause." The agreements define "good cause" to include "subsequent availability of testimony listed in . . . the print-out, the need to respond specifically to evidence at trial that could not reasonably have been anticipated during stipulation negotiations, and the need to respond to changes in the opposing party's allegations subsequent to the filing of its *Third Statement of Contentions and Proof.*" It is to be noted that the government's evidence carried with it no great surprises. Defendants have known by and large far in advance what the government intended to prove, and they have been on notice at least since August 1, 1980, that some of this proof would be introduced in the form of

be drawn from these events is that defendants had no real basis for calling these witnesses, and that, when they did decide to call them, they had no substantial need for their testimony.[6]

As for the Federal Communications Commission, its posture is likewise puzzling. Several of its former employees have testified in this case for the government[7] or have been listed as witnesses for many months,[8] without any objection from the Commission. Other employees have testified for plaintiffs in other lawsuits brought against AT&T,[9] several of them with the direct permission of the Commission.[10] Yet the Commission is now here for the first time with a formal claim of privilege, asserting, *inter alia*, that testimony by these

individuals in this case would "result in a 'chilling effect' which would injure the Commission's decision-making processes." No explanation has been forthcoming why those processes were not chilled when the Commission's officers and employees testified previously on similar subjects or why any privilege in that regard should not be deemed waived.[11]

For these reasons, the Court would be justified in disposing of this entire matter without considering the merits, simply rejecting either defendants' request on the ground that it comes too late and is too ill-supported or that of the FCC on the basis that the agency seeks to assert privilege on a selective basis, depending upon the lawsuit and the party that may be involved.[12]

FCC findings. See *United States v. American Tel. & Tel. Co.*, 498 F.Supp. 353 (D.D.C.1980). Nevertheless, because of the possible changes in emphasis brought about by its opinion of September 11, 1981, the Court has recently permitted defendants to add a considerable number of persons to its witness list so as to allow them ample opportunity for a full and vigorous defense. This is, however, a far cry from so drastic a step as the calling of a number of former FCC Commissioners and Department of Justice lawyers when defendants did not seek to call these individuals previously and when they evidently are not even now certain as to the subject matter on which they want to examine them.

6. For that reason, too, the apocalyptic picture painted in defendants' October 6, 1981 memorandum (*e. g.*, that the controversy over these witnesses presents a "fundamental substantive question going to the very heart of this case" (p. 1); that without them there would be a "dangerously incomplete record" (p. 9)) seems more than somewhat overdrawn.

7. Thus, Walter Hinchman, former chief of the Common Carrier Bureau, testified on June 18, 1981; William H. Melody, a former FCC consultant and senior economist, testified on June 8, 1981; Allen Buckalew, a former economist in the Common Carrier Bureau, testified on May 29, 1981; William L. Scott, former senior economist in the Common Carrier Bureau, testified on June 4–5, 1981; and Nina Cornell, former chief of the Office of Plans and Policies, testified on June 19, 1981. The Court discounts the FCC's explanation that it did not know of that testimony or of the fact that others have long been scheduled to testify. It is hardly conceivable that the Commission, through its employees, did not become aware of the fact that some

of its former high-ranking officials were appearing in a lawsuit which has a close substantive relationship to present responsibilities exercised by the Commission and which has received a considerable amount of publicity. See also Tr. 16395. Moreover, while the FCC is not deemed to be a part of the plaintiff for certain purposes (see *United States v. American Tel. & Tel. Co.*, 461 F.Supp. 1314, 1335–37 (D.D.C. 1978)), it is part of the government of the United States, and it may be charged with constructive, if not direct, knowledge when the litigating arm of that government calls former FCC officials as witnesses on behalf of the United States.

8. *E. g.*, Bernard Strassburg, Kelly Griffith, former Commissioner Nicholas Johnson.

9. *E. g.*, former Commissioner Kenneth Cox (in *MCI*).

10. Among these employees are the agency's former General Counsel John Pettit (in the *Mid-Texas* and *MCI* cases); Bernard Strassburg, former chief of the Common Carrier Bureau (in the *MCI* case and in *Woodlands v. Southwestern Bell*); Clyde Slease (in *MCI*); and Paul Darling, acting chief of the Tariff Division, Common Carrier Bureau (also in *MCI*).

11. If not directly, then as a part of the qualified privilege equation. See note 14, *infra*.

12. The government may not, without good reason, rely upon the testimony of FCC employees in support of its case and then, through the assertion of privilege, refuse defendants the opportunity to do the same, assuming the same subject matter is involved and the issue arises in the same privilege context. As Judge

In the exercise of its discretion, and in order to insure maximum ventilation of the facts, the Court will not dispose of the subject before it in this summary fashion.[13] In passing upon the merits of the claims of the various entities, however, the Court will, of necessity, also take into account the circumstances which generated these claims.

## II

■ The issues raised by defendants' proffers and the conflicting claims of the various interested parties fall under three headings: (1) relevance, (2) privilege,[14] and (3) Rule 403 issues.[15] It is obviously difficult to decide precisely in advance what specific questions will be asked and what rulings will be appropriate in the event objection is made or a claim of privilege is interposed, and the Court will not attempt

to do so here.[16] However, for the guidance of the interested parties, the Court has grouped the proffered proof (to the extent that it can be pieced together from defendants' descriptions) into separate categories in terms of subject matter, it has examined within each category such obstacles to admission as appear to exist, and it will set forth below the standards it intends to apply in disposing of the various claims.

## III

With respect to several matters, defendants' proffer will be rejected and the testimony will not be allowed.

■ 1. In one such category are questions that tend to probe the mental processes of the individual members of the Federal Communications Commission, calling either for the reasons underlying vari-

---

Learned Hand stated in *United States v. Andolschek*, 142 F.2d 503, 506 (2d Cir. 1944):

> [t]he government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully.

See also *SEC v. National Student Marketing Corp.*, 18 F.R.Serv.2d 1302, 1307–10 (D.D.C. 1974); *O'Keefe v. Boeing Co.*, 38 F.R.D. 329, 335 (S.D.N.Y.1965); *United States v. San Antonio Portland Cement Co.*, 33 F.R.D. 513, 515 (W.D.Tex.1963). 8 Wright & Miller, *Federal Practice and Procedure* § 2019 (1970). 4 *Moore's Federal Practice* ¶ 26.61 (1979).

**13.** In any event, defendants did list some of the witnesses earlier; and not all of the types of inquiry proposed by defendants for the FCC officials have been the subject of prior testimony by agency employees.

**14.** The privileges asserted by the FCC or the Department of Justice—deliberative process and work product—are qualified rather than absolute. See *Nixon v. Sirica*, 487 F.2d 700, 712–17 (D.C.Cir.1973) (en banc); *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D.D.C.1966), *aff'd on opinion below*, 384 F.2d 979 (D.C.Cir.1967); 8 Wright & Miller, *Federal Practice and Procedure* § 2019 (1970). As the FCC recognizes (Memorandum of October 5, 1981, p. 8) their validity in particular circumstances depends upon a balance of the public interest in nondisclosure with the need for the information as evidence. See also, *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 791 (D.C.Cir.1971); *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, supra*, 40 F.R.D. at 327; Wright & Miller, *supra*,

at 167–69. This balancing, in turn, requires the Court to consider, in addition to the privilege itself, such matters as the degree to which the proffered evidence is relevant, the extent to which it may be cumulative, and the opportunity the party offering it may have to prove the particular facts by other means. *United States v. IBM*, 20 F.R.Serv.2d 1082, 1089–91 (S.D.N.Y. 1975). Additionally, the relative lack of necessity for the invocation of a particular privilege may be indicated when the privilege has not been asserted on prior occasions.

**15.** Rule 403, Fed.Rules of Evidence, permits the Court to exclude evidence if its probative value is substantially outweighed by such factors as confusion of issues, undue delay, waste of time, or needless presentation of cumulative evidence. Rule 611, which is likewise implicated in this matter, admonishes trial courts to exercise reasonable control over the presentation of evidence so as to make the presentation effective for the ascertainment of truth, avoid needless consumption of time, and protect witnesses from harassment or undue embarrassment.

**16.** For that reason, technically, the various witnesses are required to appear if subpoenaed, and claims of privilege can be formally disposed of only thereafter when specific questions are asked. The Court expects the parties to dispense with such formal appearances, however, to the extent that the present Memorandum disposes of the substantive issues, and to preserve in some other form whatever objections they may have to the Court's rulings herein.

ous decisions of the Commission or for their understanding of what these decisions meant.[17] These matters are part of the agency's deliberative process and as such are clearly privileged. See *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941); *United States v. Nixon*, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974); *Chicago B & Q Ry. Co. v. Babcock*, 204 U.S. 585, 593–94, 27 S.Ct. 326, 327, 51 L.Ed. 636 (1907); *SEC v. National Student Marketing Corp.*, 68 F.R.D. 157, 160–61 (D.D.C.1975), *aff'd*, 538 F.2d 404 (D.C.Cir.1976). As the Supreme Court has said, disclosure of intra-agency deliberations and advice is injurious to the government's consultative function [18] because it would tend to inhibit the frank and candid discussion that is necessary for an effective operation of government.[19]

■ It is likewise clear that inquiry into such matters would not yield relevant evidence. The FCC has asserted—and the Court agrees—that that body acts officially only "through the adoption of rules, orders, policy statements which reflect its views and commands." FCC Order of September 30, 1981, par. 8. These statements are not subject to interpretation by an FCC Commissioner or employee (past or present) any more than a judicial decision is subject to

elaboration or interpretation by way of the subsequent testimony of the judicial officer who rendered it. See *SEC v. National Student Marketing Corp., supra; Thill Securities Corp. v. New York Stock Exchange*, 57 F.R.D. 133 (E.D.Wis.1972); *MCI v. FCC*, 515 F.2d 385 (D.C.Cir.1974); *Sterling Drug Inc. v. FTC*, 450 F.2d 698 (D.C.Cir.1971). In short, it makes no difference—it is not relevant—what a particular Commissioner or staff member might say today about what he understood a particular decision to mean: [20] the decision speaks for itself.

■ Defendants' basic proposition which they presumably wish to buttress through the testimony of the Commissioners—that they acted reasonably in light of FCC decisions and policies—must be tested against the expressed views of the Commission (and perhaps the further illumination of these views by subsequent FCC or judicial decisions) not through the testimony of Commissioners. See *SEC v. National Student Marketing Corp., supra.*[21] Extrinsic evidence as to how and why the FCC reached its decisions and what it intended thereby—either by Commissioners speaking in their individual capacities or by employees of the FCC—are irrelevant to the question whether defendants' compliance was reasonable.

17. *E. g.*, Defendants' "proffer," pars. 1 through 10.

18. *EPA v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973). It may be noted in this connection that the public interest in preventing the disclosure of predecisional deliberations is greater at higher levels of decisionmaking. For example, presidential communications are presumptively privileged (*United States v. Nixon, supra*, 418 U.S. at 708, 94 S.Ct. at 3107), while no such presumption applies to deliberations by lower level employees. *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, supra*. It is more important that Commissioners feel free to exchange ideas during their deliberations without fear of disclosure than it is for lower echelon staff members to have that latitude, and a stronger showing of need for the information by defendants will therefore be necessary to compel testimony by the Commissioners.

19. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51, 95 S.Ct. 1504, 1516–1517, 44 L.Ed.2d 29 (1975); *Carl Zeiss Stiftung v. V. E.*

*B. Carl Zeiss, Jena, supra; Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp. 939 (Ct.Cl.1958). See also, S.Rep.No. 1219, 88th Cong. 2d Sess. 13–14 (1964).

20. *E. g.*, whether "every member of the Commission understood that the *Carterfone* decisions dealt only with the attachment or interconnection by customers of devices to the existing telephone network, and not the replacement or substitution by customers of any part of the telephone network furnished by the telephone companies." Defendants' proffer, p. 2, par. 1.

21. If defendants are prepared to proffer that they were given contemporaneous advice by the Commission or one purporting to speak on its behalf with respect to the meaning of Commission decisions and that they relied thereon, the individual rendering such advice may be called to the stand.

Thus, both on grounds of privilege and on grounds of lack of relevancy the Court will uphold objections to questions seeking to elicit the thought processes or the intentions of FCC officials or employees to elucidate the official decisions themselves.

2. Defendants also seek to question the FCC Commissioners concerning facts found by the Commission in its various opinions (such as the facts relating to the actual and potential harm inflicted upon the network through direct interconnection of customer-provided terminal equipment).[22] Defendants are, of course, entirely correct when they state that these findings, "like any other piece of evidence, are subject to contradiction, qualification, and clarification through other evidence."[23] Indeed, the Court has already heard over thirty witnesses on defendants' terminal equipment claims, much of whose testimony served to contradict, qualify, and clarify the findings of the FCC that were admitted into evidence,[24] and it has admitted into evidence numerous documents to the same effect. Clearly, defendants have had, and will still have, ample opportunity to rebut the government's evidence about the telecommunications network, whether it was introduced in the form of findings by the FCC or otherwise.

■ But their opportunity in that regard is not unlimited. Specifically, it does not include the right to question the individual Commissioners relating to this subject matter, and the Court will exclude such testimony for three separate reasons. First, it would be difficult (if not impossible) to question these officials concerning their perceptions of the network at the time of the *Carterfone* decision without at the same time opening up the deliberative process of the Commission as a whole to judicial scrutiny. Such questioning would be fraught with implications of privilege,[25] and it should therefore be avoided if it is possible to do so consistently with defendants' legitimate rights and interests. Second, questioning the individual Commissioners as to the factual basis each had for the findings he supported would not be unlike examining the Commission's decision to determine whether it was supported by substantial evidence. Such an inquiry is a matter for the court charged by statute with the review of final FCC action—the U.S. Court of Appeals—and it is not within the jurisdiction of this Court. Third, given the fact that the defendants have introduced what by all measures is a substantial amount of evidence on this subject, the Court finds that they will not be prejudiced if the FCC Commissioners are not also permitted to testify with regard to these matters. See Rules 403, 611, Federal Rules of Evidence.

3. Defendants will likewise not be permitted to call several Department of Justice lawyers on the basis of the proffers they have made.

In the first place, defendants have wholly failed to demonstrate the "good cause" required for adding these individuals to their witness list at this late date.[26] Perhaps even more than is true with respect to the FCC officials, the reasons provided by defendants for calling the Department of Justice employees are conflicting,[27] confusing,

---

22. As stated in the Court's opinion of August 1, 1980, only those portions of FCC opinions which constitute trustworthy factual findings are admissible under the hearsay rule; hence, the Court has not admitted into evidence the prospective policy statements or the legal conclusions contained in these opinions.

23. Defendants' Reply Memorandum, p. 5.

24. The Court has recently ruled that defendants would be permitted to put on several additional expert witnesses not previously listed (such as the members of a National Academy of Science panel) whose testimony relates to the facts found by the FCC.

25. See *Davis v. Braswell Motor Freight Lines, Inc.*, 363 F.2d 600, 603–05 (5th Cir. 1966); *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, supra.

26. See note 5, *supra*.

27. In addition to the possible bases discussed in the text *infra*, defendants also claim that the Department of Justice lawyers are properly called because they were participants in the FCC regulatory process and because, having presented evidence concerning the FCC, the Department of Justice "must be held to have waived any privilege claim for its own partici-

and tenuous, and they are utterly inadequate to support the present request.

■ Originally defendants indicated that they wanted to inquire of the Department of Justice witnesses regarding the reasons for the withdrawal by the Antitrust Division of its opposition to the post-*Carterfone* tariffs. But those reasons are fully articulated in the Department's briefs. In the exercise of its discretion under Rule 403, the Court will not allow defendants, on this tangential issue, to call the lawyers who wrote that brief to provide their additional views and impressions, especially since the proposed testimony would implicate both the deliberative process and the work product privilege,[28] without any persuasive countervailing considerations.

■ In another proffer defendants made regarding the Department of Justice employees they stated that they wished to establish through these individuals what the Department of Justice knew, thought, or believed with regard to possible harms to the network from the direct interconnection of equipment, and the impact of interconnection on the telecommunications industry. The individuals involved are, of course, lawyers, not engineers or economists; their "expert" opinions as to what interconnection would do to the network, either from a technical or from an economic perspective, would therefore be of little benefit to the Court. Furthermore, again, both work-product and deliberative process privileges would directly be implicated by their testimony,[29] and the public interest in upholding these privileges far outweighs the minimal probative value of their testimony. See

*United States v. Leggett & Platt, supra;* *SEC. v. National Student Marketing Corp., supra.*[30] No constructive purpose whatever would be served by requiring these Department of Justice attorneys to relate what the Department of Justice "believed," "knew," "had sufficient experience with,"[31] and in the absence of the citation of precedent for this extraordinary request, the Court will deny it.

## IV

Defendants will be permitted to elicit the following testimony, either because it does not involve a privilege or because the applicable privilege is overridden by other considerations.

■ 1. An exception to the general thought-process rule is made where there are allegations of misconduct or misbehavior, and evidence to that effect is not privileged.[32] Such evidence would also be relevant. If it could be shown that various FCC decisions were the product of staff manipulations, these decisions, and the findings they embody, would on that basis at a minimum be entitled to less weight than would be true otherwise.

■ Accordingly, when defendants have intimated at various times that improper or undue influence may have been exerted upon the Commission through some staff members, the Court has always taken the position that defendants may confront such members with these allegations during their case in chief. The Court will now permit these staff members to be called and questioned by defendants on the issue of whether their influence on the Commission

pation in that process." Response, filed October 6, 1981, p. 8. That claim is frivolous.

28. *United States v. Amer. Tel. & Tel.*, 86 F.R.D. 603, 626–35 (D.D.C.1979); 2 *Weinstein's Evidence* par. 509[05]; *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866–68 (D.C.Cir.1980); *Jabara v. Kelley*, 75 F.R.D. 475, 494–95 (E.D.Mich.1977).

29. *United States v. Leggett & Platt, Inc.*, 542 F.2d 655, 658–61·(6th Cir. 1976); *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973).

30. Defendants have already called an enormous number of witnesses on "harms to the network," and the Court has recently allowed them to add still more witnesses to that list.

31. Defendants' "proffer," p. 5–7.

32. *Singer Sewing Machine Co. v. NLRB*, 329 F.2d 200, 208 (4th Cir. 1964); *United States v. Proctor & Gamble Co.*, 25 F.R.D. 485 (D.N.J. 1960).

exceeded the bounds set by the rules or the customary practices of that agency. If examination of these staff members reveals impropriety on the part of Commissioners,[33] the Court will entertain a motion to call them as well for further examination.

██ 2. Defendants will also be permitted to question FCC witnesses, both Commissioners and others, on various aspects of the terminal equipment certification program. In their several proffers, defendants have made three contentions they wish to prove in this regard through the examination of the FCC witnesses: (1) that the members of the Commission were not prepared in 1968 to have the FCC undertake the task of formulating and administering such a program; (2) that the FCC's experience with registration or certification was such that safe standards were not likely to be available in the late 1960s or early 1970s; and (3) that intra-FCC rivalries were responsible for the delays in the program's development.

Testimony by FCC witnesses on each of these three topics clearly or arguably raises questions of privilege. However, the government has consistently contended that

AT&T unreasonably either failed to implement its own certification program after the *Carterfone* decision was handed down or to petition the FCC to do so, and that implementation of the program was delayed because of AT&T's obstructionism. Defendants are clearly entitled to refute these contentions, and it appears that, in important respects, the FCC witnesses are the only—or a very significant—source of the necessary evidence.[34] After balancing the interest in non-disclosure[35] with defendants' need for the evidence (see note 14, *supra*), the Court has concluded that defendants will be permitted to examine these FCC officials with respect to these topics.[36]

██ 3. The Court will likewise allow questions directed to the Commissioners (or other FCC employees) on the effectiveness of that agency in regulating the conduct of the Bell System. The government has squarely put in issue through various FCC employees (including the former chief of its Common Carrier Bureau) the question whether the Commission is capable of regulating effectively an entity of the scope, complexity, and power of AT&T.[37] Defend-

---

**33.** The Court has no basis before it for believing that any such impropriety will be revealed (or indeed that any staff members are guilty of impropriety). In view of defendants' repeated suggestions regarding staff member conduct, however, and the fact that these staff members have been listed as witnesses in this regard for some time, defendants will be afforded an opportunity to explore this subject with respect to these persons without further preliminaries.

**34.** The several Commissioners presumably know best whether the FCC was willing in 1968 to undertake a certification program; FCC engineers are well situated to relate whether from the vantage point of the Commission, and given the state of technical development, a safe certification program could have quickly been constructed at that time; and FCC staff members are in all likelihood the only source of information on possible internal problems within that agency and their impact on the certification program.

**35.** As concerns the engineers, that interest is relatively slight. Moreover, to the extent that their testimony consists of facts rather than of reports of deliberations, it would not be privileged in any event. See *Machin v. Zuckert*, 316 F.2d 336, 339–40 (D.C.Cir.1963); *Boeing Air-*

*plane Co. v. Coggeshall*, 280 F.2d 654, 660–61 (D.C.Cir.1960).

**36.** Current FCC employees Messrs. Feldner, von Alvin, and Slomin (all of whom were members of the staff of the Common Carrier Bureau in the mid-1970s) will also be required to testify on these historical—not current—subjects. There is no need for the Court to consider on this aspect of the problem whether FCC Rule 0.463 (47 C.F.R. § 0.463) constitutes an obstacle to the testimony of these individuals since the Rule requires current employees to seek authorization only if they are asked to produce "records or files or to testify with respect thereto." Defendants have called these witnesses essentially for the purpose of questioning them about the development of certification, not the contents of specific documents. In any event, as explained in the discussion of privilege in the text, defendants' need to refute the government's claim clearly outweighs on this subject the interest of the FCC.

**37.** Walter Hinchman, former chief of the FCC's Common Carrier Bureau, as well as others, have testified that, as a result of such factors as an inadequate budget, high workload, lack of expert personnel, and statutory limitations

ants are entitled, and they will be permitted, to rebut that charge. Moreover, since the individuals most expert about the functioning of the Commission are the former Commissioners themselves as well as other high-level Commission employees, their testimony would be highly relevant, material, and in a sense necessary to defendants' case. The acute need of defendants to put on such testimony, in view of the government's proof and the unique expertise of the former FCC Commissioners in these matters, clearly outweighs any privilege problem [38]—especially since questions with regard to the general ability of the FCC to regulate can be crafted so as not to delve into the Commissioners' privileged deliberations in specific proceedings.[39] Accordingly, defendants may inquire of the Commissioners and other listed FCC witnesses regarding this subject.[40]

4. With regard to the questions to be posed to the members of Federal-State Joint Board established by the FCC in Docket No. 19528, a distinction may appropriately be drawn between the members of the board who were FCC Commissioners and those who were state commissioners, for the simple reason that no privilege has been asserted with respect to the latter, while the FCC has asserted privilege on behalf of the former. On that basis, the state commissioner named by defendants will be required to testify with regard to those portions of defendants' proffer which appropriately deal with the Joint Board. However, no such requirement will be imposed on those members of the board who were FCC Commissioners.

The Court could not, in a practical way, compel these officials to answer questions as if they were only members of a board making recommendations to the final decision-maker, and ignore the fact that they were also members of the Commission which considered the recommendations and made that decision. Since the testimony of the federal members would, in any event, be merely cumulative of that of the state member, the Court, taking into account the privilege problem, has determined that it is unnecessary and inappropriate to require these members to provide additional evidence on this point. Rule 403, Federal Rules of Evidence.

and procedures, the Commission has never been capable of regulating the Bell System effectively, and that, whatever might be provided in the statutes or regulations, in practice AT&T's rates and services were largely unregulated.

**38.** It is not at all certain that there is any privilege. Testimony on this subject would not necessarily expose internal deliberations on any particular issue but only the witnesses' general view of the FCC–AT&T relationship. The FCC recognizes that factual matters are not privileged. Memorandum of October 5, 1981, note 10.

**39.** See *United States v. American Tel. & Tel. Co., supra,* 86 F.R.D. at 603–11, Guidelines 1–2, 5 and cases cited therein.

**40.** The Court will allow such questions as whether the official believes that the Commission had adequate resources to perform an effective job of regulation; whether he generally found AT&T to be cooperative in supplying information, and the like. To avoid problems of privilege, however, the questioning will be restricted to the general effectiveness of the Commission, and defendants will not be allowed to inquire into possible difficulties the officials may have encountered in the context of particular decisions or investigations.