William McCONNEY

v.

The GREAT ATLANTIC & PACIFIC TEA COMPANY and Baker's Local No. 492.

Civ. A. No. 75–2077.

United States District Court, E. D. Pennsylvania.

Aug. 23, 1978.

1144

Alan J. Candell, Philadelphia, Pa., for plaintiff.

Joseph H. Huston, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for A & P.

Mark P. Muller, Freedman & Lorry, Philadelphia, Pa., for Union.

## MEMORANDUM AND ORDER

RAYMOND J. BRODERICK, District Judge.

Plaintiff, William McConney ("McConney"), brings this action under § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), alleging breach of a collective bargaining agreement. Defendants in this action are: The Great Atlantic and Pacific Tea Company ("A&P"), McConney's former employer, who is charged with discharging him in breach of the agreement; and Baker's Local # 492 ("Union"), McConney's union, charged with violating its duty under the agreement to fairly represent McConney in processing his grievance concerning his discharge. Having heard the testimony of the witnesses for the plaintiff and for the defendants during a trial before the Court without a jury, the Court enters judgment for defendants.

McConney, during May and early June, 1973, was employed as a maintenance person at A&P's Philadelphia bakery ("bakery"). He had been employed by the bakery for more than thirty-one years. At all times relevant to this suit, A&P had a collective bargaining agreement with the union covering employees in the bakery (Exhibit P–1), and McConney was a dues paying member of the union.

During the evening of May 25, 1973, electrical wires in the control panel of the roll oven in the bakery were intentionally cut. Subsequently, it was discovered that wires in the control panels of other equipment had also been cut. A&P called in Sentry Security Systems, Inc., to investigate the apparent vandalism. Vahe Garabidian, an employee of Sentry, met with Jack Crimaudo, the general manager of the bakery, M. R. Amiss, the maintenance supervisor at the bakery, and George McGrath, another A&P executive, in an attempt to ascertain the direction of the investigation. It was determined that the wires were selectively cut and that whoever cut them must have been familiar with the wiring of the equipment. They further determined that only three men with the requisite skill and knowledge would have had access to all the equipment that was damaged during the period when the wires were cut. The three maintenance persons to whom the finger of suspicion pointed were: Levi Cooper, Michael Zajac, and McConney.

Cooper, Zajac and McConney were interviewed by Mr. Garabidian and Mr. Crimaudo. Daniel McLaughlin, the union shop chairman was present at the interviews. Each person interviewed denied cutting the wires. Mr. Garibidian asked each of the men to consent to a lie detector test concerning the incident. Each was told that the taking of the test was not a condition of his employment and that A&P could not discipline him for his refusal to take the test. The union protested the giving of a lie detector test and advised the three employees not to take the test. Cooper, Zajac and McConney declined to follow the advice of the union, signed a waiver and volunteered to take the test. Of the three men tested, only McConney "failed" the test. When notified that the test showed that he had lied, McConney requested to be re-tested stating that during the test he had deliberately tried to confuse the machine by thinking that he was wearing "one black and one brown shoe." He was re-tested four days later and again "failed". In spite of the test results, McConney insisted on his innocence. Mr. Crimaudo told McConney that the evidence pointed to him and that he would be discharged unless he produced some evidence that he did not cut the wires. McConney was allowed to return to work under close supervision, but produced no exculpatory evidence. A&P scheduled a meeting with the union on June 20, 1973, at which it announced its decision to discharge McConney revealing at the closed meeting that he had twice failed a lie detector test. Mr. Crimaudo also pointed out that in addition to the lie detector tests, other statements by McConney during the course of the investigation were considered by A&P as being incriminating. It was testified that when asked by Mr. Crimaudo whether he had cut the wires, McConney replied "you don't think that I cut the wires because of my suspension last March?"[1] He was asked whether he had shut down the roll oven on the Friday evening in question. He said that Zajac had done it. Zajac was immediately questioned about this and insisted that he had not shut down the roll oven. When presented with Zajac's testimony, McConney stated that he probably had shut down the roll oven. At one point, when questioned by Mr. Crimaudo, McConney denied cutting wires on the blender. This was the first time that Mr. Crimaudo had heard that wires on the blender had been cut. He immediately investigated and found those wires had also been cut. It was

---

1. In March, 1973, McConney had been terminated by A&P in connection with his having left "grindings" in one of the machines on which he had been working, resulting in a substantial loss to the company. As a result of union efforts, his termination was eventually reduced to a suspension of 2 or 3 days.

also testified that McConney had stated to several people, "Could I have done this thing and not remembered it?"

At the June 20th meeting, members of the union shop committee stated that they had known McConney for years and could not believe that he had done such a thing, and, in any event, given the length of McConney's service for A&P, termination was too severe a sanction. Within a week of his discharge, McConney went to the union hall and requested that the union help him get his job back. He was told by union officials that they would do everything possible to get him reinstated. When these officials asked McConney why he had consented to a lie detector test, he replied that he thought he could beat the machine. McConney asked the officials whether they thought he "could . . . have done this thing and not remembered it?" The officials called the union's international which set up a meeting with A&P on July 11, 1973.

At the July 11th meeting with A&P, the union pleaded for McConney's reinstatement. The union pointed to his long years of service to the company and his family obligations and argued that if McConney were responsible for the vandalism, future damage could be prevented merely by transferring him to another job within the bakery where he would be more closely supervised. A&P replied that they would not reinstate McConney.

A few days later, McConney went to the union hall where he was told the results of the July 11th meeting. He was informed that nothing more could be done for him. McConney testified at trial that he had requested the union to take his case to arbitration. All the union officials who testified denied that McConney had requested arbitration. They stated that even if he had made such a request, they would not have proceeded to arbitration with his grievance since his chances of succeeding in arbitration were "nil", and that arbitration would be a waste of time and scarce union funds.

Article VII of the collective bargaining agreement between A&P and the union provides for a four step grievance procedure, the final step of which is binding arbitration. Congress has expressed a strong preference that employment grievances be settled by the "method agreed upon by the parties . . . ." 29 U.S.C. § 173(d). Such provisions are among those which may be enforced pursuant to § 301 of the LMRA. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 1055–7, 47 L.Ed.2d 231 (1976). As a condition precedent to an employee proceeding under § 301 he first must exhaust the remedies provided by the collective bargaining agreement. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). As recently pointed out by the Supreme Court in *Hines,* an employee who brings a wrongful discharge suit against his employer and the union under § 301 of the LMRA has the burden of showing not only that his discharge was contrary to the collective bargaining agreement, but also has the burden of demonstrating that his union breached its duty of fair representation in connection with the discharge. 96 S.Ct. at 1060. This Court finds on the basis of the record of this case that McConney has failed to establish by a preponderance of the evidence either that his discharge was contrary to the collective bargaining agreement or that the union breached its duty of fair representation.

Article VIII of the collective bargaining agreement provides that "[e]mployees shall be discharged only for justifiable cause." (Exhibit P–1). A&P discharged McConney for his alleged role in the cutting of wires at the bakery. Before terminating McConney, A&P called in investigative experts to aid in the investigation of wire cutting. It was determined that only three men had the requisite knowledge, skill and access to cut the wires in question. Of the three, only McConney gave conflicting and incomplete answers to questions, made incriminating statements, and twice "failed" a lie detector test. A&P gave him the opportunity to come forward with exculpatory evidence. McConney produced no such evidence.

Whether A&P had "justifiable cause" to discharge McConney within the meaning of the contract is a question for the finder of fact, in this case, the Court. *Whitten v. Anchor Motor Freight, Inc.,* 521 F.2d 1335, 1338 (6th Cir. 1975); *Scott v. Anchor Motor Freight, Inc.,* 496 F.2d 276, 281 (6th Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 107 (1974). As we previously stated, this Court finds that McConney failed to prove by a preponderance of the evidence that his discharge was without justifiable cause; in fact, we find that A&P had justifiable cause to terminate McConney.

In order to prevail in this action, McConney (as we heretofore pointed out) would also have had to establish by a preponderance of the evidence that the union breached its duty of fair representation in connection with his discharge. The union is charged with the fiduciary duty to fairly represent the employee in his grievance with the employer. *Bazarte v. United Transportation Union,* 429 F.2d 868, 871 (3d Cir. 1970). The union breaches this duty "only when [its] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). Although McConney testified that he had requested the union to take his grievance to arbitration, all the union officials denied that he made such a request and testified that his chances of succeeding in arbitration were "nil" and that arbitration would be a waste of time and union funds. The Court in *Vaca* went on to say:

> There has been considerable debate over the extent of this duty in the context of a union's enforcement of the grievance and arbitration procedures in a collective bargaining agreement . . . Some have suggested that every individual employee should have the right to have his grievance taken to arbitration. Others have urged that the union be given substantial discretion (if the collective bargaining agreement so provides) to decide whether a grievance should be taken to arbitration, subject only to the duty to refrain from patently wrongful conduct such as racial discrimination or personal hostility.
>
> Though we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement. . . . In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. . . .
>
> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined . . . . For these reasons, we conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration. 386 U.S. at 190–92, 87 S.Ct. at 916–918 (footnotes omitted).

In this case, the collective bargaining agreement specifically provides: "[n]o individual employee shall have the right to invoke arbitration without the written consent of the Union." Article VII(f). The union concluded that arbitration would be fruitless. We find that the union did not breach its duty of fair representation by its failure to submit McConney's grievance to arbitration.

Representatives of the Local and the International met with A&P on two occasions, June 20, 1973 and July 11, 1973, pleading that the discharge be rescinded. There is no evidence that the union's representation was anything other than sincere and in good faith. Nor is there evidence that the union arbitrarily ignored a meritorious grievance or processed the grievance in a

perfunctory fashion. There is no basis in the record upon which the Court could reasonably find that the union's conduct in handling McConney's discharge was arbitrary, discriminatory, or in bad faith.

This Memorandum and Order is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## ON MOTION FOR NEW TRIAL

Plaintiff, William McConney, brought this action under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), alleging breach of a collective bargaining agreement ("Agreement"). Defendants in this action are The Great Atlantic & Pacific Tea Company ("A&P"), McConney's former employer, and Baker's Local No. 492 ("Union"), McConney's union. Plaintiff alleges that A&P discharged him in breach of the Agreement and that the Union violated its duty under the Agreement to fairly represent McConney in processing his grievance concerning his discharge. The case was tried before the Court, sitting without a jury, on January 4, 10 and 11, 1977. In a memorandum and order dated January 18, 1977, the Court made findings of fact and conclusions of law and filed an order entering judgment against the plaintiff and in favor of both defendants. On January 27, 1977, plaintiff filed a motion for a new trial on the grounds that:

"a) said findings of fact and conclusions of law were against the weight of the evidence;

"b) evidentiary rulings, including, but not limited to, the admissibility of evidence concerning the results of lie detector tests, and the Court's denial of Plaintiff's several motions for Mistrial, were erroneous as a matter of law; and

"c) such other reasons, both legal and factual in nature, as may be determined by review of the notes of testimony."

### I. Jury Trial.

On June 28, 1978, plaintiff filed a memorandum in support of his motion for a new trial in which he raised for the first time as a ground in support of his motion that the Court abused its discretion in not granting plaintiff's motion for a jury trial.[1]

The Third Circuit has held that a party may not reserve the right to set forth additional grounds in support of its motion for a new trial until after the notes of testimony are received. In *Arkwright Mutual Ins. Co. v. Philadelphia Electric Co.*, 427 F.2d 1273, 1275–76 (3d Cir. 1970), the court stated:

Turning to appellants' motion for a new trial, we are initially faced with a procedural question under Rule 59(b), Fed.R.Civ.Pro. That rule provides that a motion for a new trial "shall be served not later than 10 days after the entry of judgment." In the instant case, the district court entered final judgment on February 17, 1966. Eight days later appellants filed their motion for a new trial in which they advanced nine specific grounds. Included in the closing paragraph of the motion was a statement which purported to "reserve the right to file and specify additional errors upon the receipt of the transcript of the testimony." Over two years later—and approximately ten months after the transcript had been filed—appellants presented 38 "additional reasons" for a new trial. The district judge ruled that the 10 day limit of Rule 59(b) prevented consideration of these additional reasons. We agree.

This court has previously held in *Massaro v. United States Lines Co.*, 307 F.2d 299, 303 (3 Cir. 1962) and *Russell v. Monongahela R. Co.*, 262 F.2d 349, 354 (3 Cir. 958), that a district court is without authority to grant a new trial for reasons assigned after the mandatory 10 day period under Rule 59(b). Since appellants relate no extraordinary circumstances which might conceivably allow considera-

---

1. The other two grounds raised in his memorandum had previously been advanced in his motion: a) the Court erred in admitting testimony concerning the results of lie detector tests, and b) the verdict of the Court was contrary to the clear weight of the evidence.

tion under Rule 60(b), the district court could not award a new trial for any of the additional reasons.

(footnotes omitted).

■ In view of the fact that the plaintiff has stated no extraordinary circumstances which might conceivably allow consideration of this ground under Fed.R.Civ.P. 60(b), for the reasons set forth by the Court in *Arkwright,* this Court is without authority to consider this allegation raised for the first time more than seventeen months after the 10 day period provided by Fed.R.Civ.P. 59(b) had expired. *See also Norfolk & Western Ry. v. Hardinger Transfer Co.,* 415 F.Supp. 507, 509 (W.D.Pa.1976); *Smith v. Pressed Steel Tank Co.,* 66 F.R.D. 429, 432 (E.D.Pa.), *aff'd,* 524 F.2d 1404 (3d Cir. 1975); *but see Pogue v. Int'l Industries, Inc.,* 524 F.2d 342, 344 (6th Cir. 1975). We point out, however, that the record in this case shows that no written demand for a jury trial was filed by the plaintiff in accordance with Fed.R.Civ.P. 38(b) which requires that such a demand be made not later than ten days after the service of the last pleading directed to the issue to be tried.

In an affidavit attached to plaintiff's memorandum, counsel for plaintiff stated:

[T]hat prior to the trial of the matter of *William McConney v. The Great Atlantic and Pacific Tea Company and Baker's Local # 492* a pre-trial conference was held in the chamber of the Honorable Raymond J. Broderick; that at the time of the pre-trial conference, pursuant to Rule 39(B) of the FRCP, an oral motion was made to grant a jury trial; that the basis of said motion was that disclosures had been made to the Court that William McConney had taken two lie detector tests, and failed same; that said disclosures were prejudicial to the Plaintiff and that denial to grant the said motion

would greatly prejudice the right of the Plaintiff at the time of trial.[2]

Fed.R.Civ.P. 39(b) provides:

notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by jury on any or all issues.

■ Plaintiff advanced no explanation for his delay in demanding a jury trial. It has been held that mere inadvertence, oversight, or lack of diligence on the part of counsel is not sufficient ground to evoke relief under Rule 39(b). *Biesenkamp v. Atlantic Richfield Co.,* 70 F.R.D. 365, 366 (E.D. Pa.1976); *Sauter v. Sauter,* 57 F.R.D. 537, 538 (E.D.Pa.1972). Furthermore, in the exercise of its discretion, the court may consider whether the issues in the suit particularly require a jury trial. *Godfrey v. Pabst Brewing Co.,* 15 Fed.R.Serv.2d 1309 (E.D. Pa.1972). Plaintiff sought both money damages and equitable relief, *i. e.,* reinstatement to his former position with the A&P. A non-jury trial in this situation was appropriate and the Court did not abuse its discretion in denying plaintiff's request. *See Fontaine v. Tasty Baking Co.,* 20 Fed.R. Serv.2d 490, 491 (E.D.Pa.1975); *Washington County Ins. Co. v. Wilkinson,* 19 F.R.D. 177, 178 (D.Md.1956).

II. *Evidence Concerning Lie-Detector Tests.*

■ Plaintiff contends that the Court erred in permitting the defendants to present testimony concerning the results of lie detector tests taken by plaintiff. Prior to the commencement of trial, plaintiff requested the Court to rule that "any reference or mention of the taking of lie-detector tests or administering of same to my client be omitted from the trial of this matter." The Court responded:

---

**2.** Plaintiff's oral motion was not in accord with Fed.R.Civ.P. 7(b) which states:

An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds

therefor, and shall set forth the relief or order sought.

Plaintiff's oral motion was not made during a hearing or trial, but rather during a pre-trial conference.

I have always found it to be a better procedure, at least for the judge, to rule on the admission of evidence and objections when they come up during the trial.

Now, we don't have a jury here and when and if such references are, let's say, attempted to be put into the record I will make my ruling at that time . . . based on whatever the record shows at that particular time. . . . I want to wait and see in what context whoever it is wants to offer it and I [will] make my ruling at that time.

(N.T. 4–5).

Plaintiff was the first witness. On direct examination, counsel for the plaintiff questioned him at length about the administration and results of lie-detector tests—the lie detector tests which plaintiff's counsel had asked the Court to rule inadmissible. (N.T. 44–50). In connection with the presentation of the defendants' evidence, plaintiff objected to the Court hearing evidence from the expert who administered the lie-detector tests. In view of the fact that plaintiff himself testified on direct examination concerning the administration and results of the lie-detector tests, the defendants were entitled to explore this matter and present this evidence.[3] *London v. Standard Oil Company of Calif., Inc.*, 417 F.2d 820, 825 (9th Cir. 1969).[4]

III. *Sufficiency of the Evidence.*

Finally, plaintiff contends that the verdict of the Court was contrary to the clear weight of the evidence and is based upon a manifest error of law. This Court's findings of fact and conclusions of law were set forth in a nine page memorandum dated January 18, 1977, a copy of which is appended to this memorandum.

■ A motion for a new trial in a non-jury case should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons. Wright & Miller, *Federal Practice and Procedure*, Civil § 2804. A review of our memorandum and order of January 18, 1977 convinces us that it was not based upon a manifest error of law or mistake of fact. *See, e. g., Johnson v. AAA Trucking Co.*, 448 F.Supp. 1347 (E.D.Pa., 1978); *Miller v. Greyhound Lines, Inc.*, No. 74–633 (E.D.Pa., filed May 25, 1977).

Accordingly, an Order will be entered denying plaintiff's motion for a new trial.

---

**3.** In ruling on the objection, the Court noted:

Of course, I am a little bit perplexed by the objection because you had indicated to me before the trial started that you were going to so question the admissibility and then you proceeded with your witness to have him testify about the taking of the lie-detector test. . . . I was prepared to wrestle with the problem of the admissibility of the evidence in connection with the lie-detector test and then I heard the plaintiff testify that he took it and took it again and that amazed me.

(N.T. 367–68).

**4.** Plaintiff also contends that the Court erred in not granting his motion for a mistrial at the conclusion of the defendants' opening arguments in which he claimed that the numerous references to the taking of lie-detector tests and to their results prejudiced the plaintiff. The Court denied the motion stating, "This matter has been discussed before and I will say this—if I determine the evidence is not admissible it won't be used . . . ." (N.T. 26). As heretofore noted, prior to our having to determine whether said evidence was admissible, plaintiff himself introduced it.