Stephen T. AGUINAGA, et al., Plaintiffs,

v.

JOHN MORRELL & COMPANY, et al., Defendants.

Civ. A. No. 83–1858.

United States District Court, D. Kansas.

Oct. 21, 1986.

See also, D.C., 602 F.Supp. 1270.

Robert C. Brown, Ken M. Peterson and Dennis M. Feeney, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for plaintiffs.

Mikel Stout, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for John Morrell & Co.

Irving M. King and Peggy A. Hillman, Cotton, Watt, Jones & King, Chicago, Ill., for United Food and Commercial Workers Intern. Union, AFL–CIO/CLC, and Local Union 340, and United Food and Commercial Workers.

## OPINION AND ORDER

THEIS, District Judge.

This matter is presently before the Court on the motions of the defendants, United Food and Commercial Workers International Union, AFL–CIO/CLC, and Local 340 of the United Food and Commercial Workers ("the unions") and John Morrell & Company, for review of the magistrate's order granting plaintiffs' motions to compel the defendants to produce certain documents. The standard of review applicable to the present motion is set forth in 28 U.S.C. § 636(b)(1)(A), which states that a magistrate's order shall not be set aside unless it is found to be "clearly erroneous or contrary to law." This Court has held that "[a]n abuse of discretion can be found ... only if no reasonable person would take the view adopted by the magistrate ... or if the magistrate's order was arbitrary and capricious." *Devore & Sons, Inc. v. Aurora Pacific Cattle Co.*, 560 F.Supp. 236, 239 (D.Kan.1983).

## I. FACTS

The following facts are essentially agreed upon by the parties, with characterizations or allegations noted as they occur. The defendants, Morrell and the unions, have been involved in collective bargaining with each other or their predecessors since the 1940's. The Morrell plant at Arkansas City, Kansas, known as the Rodeo plant, was covered by a local agreement until the mid 1960's when it became part of a multi-plant bargaining unit covered by a Master Agreement. The Master Agreement between the unions and the company governed the terms and conditions of employment at all Morrell-owned plants covered by its terms, which included plants in Arkansas City, Kansas; Memphis, Tennessee; El Paso, Texas; Fort Smith, Arkansas; Sioux Falls, South Dakota; East St. Louis, Illinois; Estherville, Iowa; Cincinnati, Ohio; and St. Paul, Minnesota.

On September 1, 1979, Morrell and the local union signed a new comprehensive collective bargaining agreement, known as the Master Agreement, which by its terms expired on September 1, 1982. By 1981, Morrell faced serious financial problems. Many of its plants were losing money because Morrell's labor costs under the 1979 Master Agreement were higher than those of Morrell's regional competitors. Morrell requested that the unions make wage and benefit concessions and stated that it might be forced to close certain plants if concessions were not made. The requests were rejected, after which Morrell issued notices of closing at several of its plants.

On December 16, 1981, Morrell issued a notice of closing at the Rodeo plant in Arkansas City, Kansas. This notice, which was required by the collective bargaining agreement, allowed Morrell to close the Rodeo plant in six months in the event that formal negotiations proved unsuccessful. At that time, Morrell's president, Donald Slotkin, asked his general counsel, Ray Gass, and outside counsel to determine the legal ramifications of closing Rodeo. Slotkin also asked Gass to analyze the legal effect of the collective bargaining agreement on such matters as selling the plants or reopening them at a later date if they could be operated economically.

On May 13 and 14 of 1982, at a negotiating meeting with the union, the company made its only offer for a new wage and benefit package to keep the Ark City plant open. Although representatives of the union were angry about the offer, they presented the issue for a vote to the Rodeo

workers on May 18, 1982. The members of Local 340 voted unanimously to support their bargaining committee's decision to reject that offer. On June 19, 1982, the Rodeo plant closed as scheduled.

In August of 1982, Morrell asked the union for the right to reopen the plants outside the restrictions and wages specified in the Master Agreement. Morrell proposed to delete sections 100 and 101 of the Master Agreement, which sections could be read to restrict Morrell's ability to resume operations at the closed plant. Section 100 prohibited Morrell from obtaining production at a closed plant for five years by leasing, selling or contracting the plant out to a third-party producer. Section 101 stated that if the company were to establish a new plant in the Midwest or far West—but not the Southeast, Southwest or Northeast—it would come under the Master Agreement. The unions opposed Morrell's requests regarding sections 100 and 101. On August 31, 1982, the 1979 Master Agreement expired. The union and the company continued their negotiations concerning a new Master Agreement during the first few days of September.

Initially, Morrell sought to eliminate Section 100 from the Master Agreement and requested a concession that would enable it to reopen all of the closed plants, not just Ark City. Later Morrell softened its bargaining position and suggested that Section 100 could remain untouched, but Section 101 should be interpreted as placing four of the six plants outside the reach of the Master Agreement. All parties agree that these negotiations were the most acrimonious ever held between Morrell and the union. On September 10, 1982, Eugene Cotton, counsel for the union, declared that a fraud suit would be filed if Morrell were to reopen.

Morrell and the union executed two side letter agreements on September 10, 1982. The first letter stated that for purposes of Section 101, the Fort Smith, El Paso and Ark City plants were in the "Southwest" and the Memphis plant was in the "Southeast," thereby excluding them from Section 101. The second letter stated that nothing in the Master Agreement precluded Morrell from reopening those plants and, if Morrell did, they would not be subject to the Master Agreement. In essence, the union agreed that Morrell could reopen the Ark City plant without violating the Master Agreement and without any contractual obligation to recognize the former union or rehire any of its members. The unions suggest that their inducement to enter this agreement was the ability to end a strike and preserve over 2,600 members' existing jobs at Sioux Falls and East St. Louis, on whose behalf the contract was negotiated. It is these negotiations that plaintiffs characterize as the "first conspiracy." The plaintiffs submit that during the same time frame the union was privately agreeing to allow Morrell to reopen the Ark City plant, the union represented in a newsletter to its members at the Sioux Falls, South Dakota plant that it would be devastating to accede to Morrell's demands that it be permitted to reopen the Rodeo plant.

On March 24, 1983, the Rodeo plant was reopened by Morrell as the Ark City Packing Company ("ACPC"). The new plant was restricted to a pork kill and cut operation. Morrell hired a new work force, smaller in size than before because of the reduced scope of the plant operation. Morrell's hiring criteria resulted in the hiring of a mix of workers: some people who had not formerly worked for Rodeo and who had not been members of Local 340 and some who were employees and members when Rodeo closed. During the startup of ACPC, the International Union notified Morrell that it represented the former members of Local 340 and asserted that the company was obligated to hire its entire workforce from those former members. Morrell declined to do so.

One week after the Rodeo reopening, the union filed with the National Labor Relations Board ("NLRB") a charge of unfair labor practices against Morrell, alleging that the company had unilaterally altered the terms and conditions of employment and attempted to avoid its collective bar-

gaining obligations. Morrell countered by filing with the NLRB a charge against the union which challenged the results and procedure by which the union claimed to represent a majority of the ACPC employees. In May and June of 1983, Morrell and the union met to negotiate a collective bargaining agreement which would cover the ACPC employees. Once the new contract terms had been reached, the union asked the NLRB for permission to withdraw the unfair labor charges, and the NLRB granted the request. Morrell withdrew its election petition.

The union maintains that it decided to drop the charge for a variety of reasons: (1) if the NLRB issued a complaint, the company would close the Rodeo plant, and the union workers would again be without work; (2) the litigation before the NLRB and the courts would take a number of years and a successful result was not guaranteed; and (3) it was typical practice in labor negotiations to put aside litigation once a collective bargaining agreement was struck. The plaintiffs characterize the withdrawal of the charge in exchange for union recognition as the "second conspiracy." The plaintiffs also allege that the unions and the company fraudulently concealed the "conspiracies." Defendants admit that negotiators for the unions requested that the letter agreements not be made public, but argue that it was standard business practice to keep them confidential, since the party making concessions does not wish to make the concession known to the rest of the industry to avoid demands for similar concessions from other quarters.

The plaintiffs, and the class they represent, were members of Local 340 when Rodeo closed on June 20, 1982. They were not rehired by Morrell when the plant reopened on March 24, 1983, as Ark City Packing Company. The complaint was filed in this case on September 23, 1983, against Morrell, Local 340 and the International Union. Plaintiffs allege that Morrell, at the time it closed the Rodeo plant, had no intention to permanently close the facility, sought to avoid its contractual obli-

gations under the Master Agreement, and planned to later reopen the plant under conditions more favorable to Morrell. Plaintiffs further contend that the unions and Morrell conspired to avoid the objectionable provisions of the Master Agreement and to designate the unions as the new collective bargaining agents of the new Morrell workforce at ACPC. Finally, the plaintiffs allege that the unions violated their duty of fair representation. Morrell and the unions deny these allegations and assert various affirmative defenses.

## II. THE MAGISTRATE'S ORDER

The records and documents under discussion can be described generally as written communications between the defendants, their officers and employees, and the lawyers for the respective defendants concerning the plant closing and reopening. In his order of April 4, 1986, sustaining plaintiffs' motion to compel production of these documents, Magistrate John B. Wooley ruled as follows: (1) that the attorney-client privilege and work product doctrine applied to the documents submitted by the defendants for *in camera* inspection; (2) that the plaintiffs had made a sufficient showing of need and hardship to pierce the work product bar asserted by the defendants; (3) that the plaintiffs had demonstrated a prima facie case that the defendants had committed a crime or fraud sufficient to invoke the crime or fraud exception to the attorney-client privilege and the work product doctrine; and (4) that Morrell was required to produce to the plaintiffs all documents reviewed by Darrell Howe in preparation for his deposition.

Specifically, with respect to the union's documents, the Magistrate held that those numbered 1, 2, 9, 14, 21, 39, 43, 44 and 49 contained material protected only by the attorney-client privilege, those numbered 13, 17 and 18 contained material protected only by the attorney opinion work product doctrine, and those numbered 3, 6, 7, 8, 10, 15, 20, 22, 24, 27, 28, 29, 37, 40, 41, 45, 47 and 49 contained both attorney-client privileged material and attorney opinion work

product material. The balance (documents numbered 4, 5, 11, 12, 16, 19, 23, 25, 26, 30, 31, 32, 33, 34, 35, 36, 38, 42, 46 and 50) appeared to contain nothing protected by either the privilege or the work product bar. Dk. no. 149, p. 15. The Magistrate did not disagree with Morrell's characterization that its documents numbered 6, 27, 36, 37, 38, 51 and 52 were protected by the attorney-client privilege, that documents numbered 53 and 56 were protected by the work product doctrine, and that the remaining forty-six documents were protected from disclosure by both the attorney-client privilege and the work product doctrine.

These documents have been provided to this Court by the defendants for *in camera* inspection, and the Court has carefully reviewed all of the documents. While several of the Magistrate's rulings regarding the application of the attorney-client and work product protections involved judgment calls, this Court cannot say the rulings were clearly erroneous or contrary to law. Therefore, the Court shall affirm the Magistrate's decision with regard to the applicability of the attorney-client privilege and the work product doctrine to the documents in question. Since the Court has determined that the information sought is in fact privileged, the Court must next ascertain whether there is some basis to override those privileges.

## III. THE UNIONS' ASSERTION OF THE ATTORNEY–CLIENT PRIVILEGE AGAINST THE PLAINTIFFS

The unions asserted the attorney-client privilege and the work product doctrine against the union members who comprise the plaintiff class. The Magistrate concluded that union officials owed a fiduciary duty to the union members. Consequently, he held that the unions could not claim the attorney-client privilege against their "beneficiaries," the union members. Magistrate Wooley relied on the principles enunciated in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), as the basis for this fiduciary exception.

### A. The Garner Exception

In *Garner* stockholders of the First American Life Insurance Company of Alabama ("FAL") brought a class action suit directly against the corporation and derivatively against its officers, alleging numerous violations of federal securities laws in connection with the sale of FAL stock. The plaintiffs sought to depose the man who had served as attorney for the corporation during the period of the challenged stock issuance and who later became the corporation's president. Some of the plaintiffs' proposed questions probed the substance of discussions at meetings attended by the attorney and corporate officials and sought information furnished to the attorney by the corporation. The defendants refused disclosure on the ground that the attorney-client privilege protected the attorney's communications to and from the corporate officials.

The United States Court of Appeals for the Fifth Circuit rejected the absolutist position of the district court that a corporation could never assert the privilege against its stockholders. *Garner v. Wolfinbarger*, 280 F.Supp. 1018 (N.D.Ala. 1968). The Fifth Circuit also refused to adopt the position of the corporation that such communications were unqualifiedly privileged. The *Garner* court balanced the interests involved, because the corporate defendants purportedly were acting in the plaintiff shareholders' best interests at all times: "Management judgment must stand on its merits, not behind an ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is, at least in part, exercised." 430 F.2d at 1101. Thus, the court held that when stockholders of a corporation bring a derivative action for behavior allegedly inimical to stockholder interests, the availability of the attorney-client privilege should "be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Id.* at 1103–04.

The court listed nine factors to be considered in determining whether shareholders have "good cause" for compelling the disclosure of documents, despite assertion of the privilege:

> ▪ the number of shareholders [calling for the information] and the percentage of stock they represent; [2] the bona fides of the shareholders; [3] the nature of the shareholders' claim and whether it is obviously colorable; [4] the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; [5] whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; [6] whether the communications related to past or prospective actions; [7] whether the communication is of advice concerning the litigation itself; [8] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; [9] the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

*Id.* at 1104. The court's decision made it clear that the foregoing itemization was not exhaustive and that no single factor or combination of factors was dispositive.

The analytic foundation upon which *Garner* rests is the theory that the attorney-client privilege does not belong exclusively to corporate officials, but also belongs to its shareholders. The Fifth Circuit noted that where "the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy with the other." *Id.* at 1103. The court compared litigation between a corporation and its shareholders to litigation between parties that once had a common interest. Further, the court recognized that communications by a client to an attorney before or during the commission of a crime or fraud have never been privileged, and the court pointed out that the *Garner* stockholders claimed to be the victims of a variety of corporate improprieties.

The *Garner* doctrine attempts to balance the extent of shareholder interests in a suit and the likelihood of harm to those interests against the harm to management flexibility:

> On the one hand, management is under a legal obligation to serve the best interests of the corporation, and since the corporation is owned by its stockholders, it would seem anomalous to deny stockholders access to information ostensibly gathered for their own ultimate benefit. On the other hand, the complete removal of the attorney-client privilege from the grasp of the corporate client (based on the supposed identity between a corporation and its stockholders) ... would expose corporations to harassment suits by minority stockholders and a possible deterioration of candid attorney-client communication and effective corporate management.

*Cohen v. Uniroyal, Inc.*, 80 F.R.D. 480, 483 (E.D.Pa.1978). The *Garner* court concluded that the countervailing interests of the corporation and its shareholders are both valid, but must be weighed against each other to determine whether there is good cause for the corporation's interest in confidentiality to yield to the shareholders' interest in full disclosure.

### B. Extension of the Garner Doctrine

In the first reported post-*Garner* decision, *Bailey v. Meister Brau*, 55 F.R.D. 211 (N.D.Ill.1972), the plaintiff, a shareholder and former officer of the Black Company, alleged that Meister Brau, the company which had acquired Black, had conspired with the Black family and executors of the Black estate to breach his contract right to purchase the company. Bailey sought to depose Cappadocia, an officer of Meister Brau who had become president and chairman of the board of Black shortly before it was purchased by Meister Brau, with respect to communications Cappadocia had with Meister Brau's counsel prior to the acquisition. The court rejected the contention that Cappadocia had worn a "Meister Brau hat" exclusively during the discus-

sions, and held that Cappadocia had been under a continuing fiduciary obligation to Bailey, a Black shareholder. The *Bailey* court applied the *Garner* balancing test and stated that management's fiduciary duties gave Bailey an interest in the communications sufficient to outweigh the interests served by confidentiality. While the court recognized that *Garner* involved a situation in which the communications were with counsel for the corporation in which the plaintiffs were shareholders, the *Bailey* court determined that the *Garner* rationale applied with even more force when "an executive's communications have been with counsel for a party whose interests are potentially adverse to those of the executive's shareholders." *Id.* at 214.

The next variation on the *Garner* theme came in *Valente v. Pepsico, Inc.*, 68 F.R.D. 361 (D.Del.1975), a class action suit brought by the minority shareholders of Wilson Sporting Goods, Inc., seeking damages from Pepsico for an allegedly illegal merger with Wilson. During the time period preceding the merger, the general counsel of Pepsico had sat on Wilson's board of directors and Pepsico had possessed a controlling interest in Wilson. The plaintiffs requested certain information relating to the fairness of the merger. Pepsico denied the request and invoked the attorney-client privilege. The *Valente* court granted discovery of the documents. The court extended the *Garner* principle to hold that Pepsico was not only a fiduciary in its position as a corporation, but that it also owed a fiduciary obligation to the minority shareholders because of its position as the majority shareholder. The *Valente* court held that "[a] fiduciary owes the obligation to his beneficiaries to go about his duties without obscuring his reasons from the legitimate inquiries of the beneficiaries." *Id.* at 370.

The trigger for application of the *Garner* principles is a fiduciary relationship between the person or entity asserting the attorney-client privilege and the person or entity attempting to obtain the information. This was illustrated in *In Re Colocotronis Tanker Securities Litigation*, 449 F.Supp.

828 (S.D.N.Y.1978), which involved a number of transactions in which the European-American Banking Corporation ("EABC") entered into loans with a group of shipping companies and then established participation agreements with the plaintiff banks regarding the loans. The banks sought certain documents from EABC which EABC claimed were privileged. While recognizing the vitality of the *Garner* doctrine, *id.* at 838, the *Colocotronis* court held that *Garner* did not apply in that case because the key element of a fiduciary relationship was absent. "The fact that EABC occupied a central position in these transactions and that EABC managed the loans whose profitability would inure to the benefit of the plaintiffs does not mean that these agreements established a special fiduciary or trust relationship." *Id.*

One court refused to apply *Garner* outside the context of shareholder derivative litigation. In *Weil v. Investment/Indicators Research & Management*, 647 F.2d 18 (9th Cir.1981), the plaintiff alleged that the defendants had violated federal securities laws in offering shares of an investment fund. The defendants invoked the attorney-client privilege regarding advice given to the fund by counsel concerning the registration of fund shares. The Ninth Circuit Court of Appeals found *Garner* inapposite because the plaintiff was not currently a shareholder and because the action was not a derivative suit. *Id.* at 23. One commentator noted that the *Weil* decision was "both unexceptional and technically correct. There was clearly little or no basis in *Weil* for a *Garner* motion, since the defendant corporation was in litigation with only one former shareholder—not with a class consisting of a substantial number of past shareholders, or with *any* present shareholders." Lewis, *The Availability of the Attorney-Client and Work Product Privileges in Shareholder Litigation*, 32 Cleveland State L.Rev. 189, 204 (1984) (emphasis in original). However, shortly after *Weil*, the Fifth Circuit, the creator of the *Garner* doctrine, made it clear that the *Garner* rationale was not limited to deriva-

tive suits by current shareholders. *See In Re International Systems & Controls Corporation Securities Litigation,* 693 F.2d 1235, 1239 n. 1 (5th Cir.1982).

A number of courts have applied the *Garner* doctrine outside the corporate shareholder litigation context to cases involving other types of fiduciary relationships. In *Donovan v. Fitzsimmons,* 90 F.R.D. 583 (N.D.Ill.1981), the Secretary of Labor brought suit under the Employee Retirement Income Security Act against a pension fund, claiming that fund officials had breached their fiduciary duties to fund beneficiaries by entering into questionable financial transactions. The court rejected the defendants' attempts to assert privilege claims against the Secretary, who was in effect acting on behalf of the plan beneficiaries. Specifically rejecting the argument that the *Garner* doctrine represented a "radical departure from settled principles," the court noted that there was no justification against extending the *Garner* rule from the corporate fiduciary context into the pension fund trustee situation. *Id.* at 586. *See also Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co.,* 543 F.Supp. 906 (D.D.C.1982) (attorney-client privilege not available to fiduciaries because the exercise of their authority was not for themselves but for the trust's beneficiaries).

In *Quintel Corp. v. Citibank,* 567 F.Supp. 1357 (S.D.N.Y.1983), the court held that a bank which acted as a fiduciary for the plaintiff in a land acquisition transaction could not assert the attorney-client privilege with respect to communications made during the course of the bank's relationship with the purchaser. The *Quintel* court reasoned as follows:

> Here, as in *Garner* and *Valente* and the ERISA cases, the fiduciary's duty to exercise its authority without veiling its reasons from the grantor of that authority outweighs the fiduciary's interest in the confidentiality of its attorney's communications. The *Garner* rule stems not only from the general proposition that a beneficiary is entitled to know how the

authority he has granted has been exercised but on the recognition that because of the mutuality of interest between the parties, the faithful fiduciary has nothing to hide from his beneficiary.

*Id.* at 1363. In *Estate of Torian v. Smith,* 263 Ark. 304, 564 S.W.2d 521 (1978), the court held that an executor of a will could not assert the attorney-client privilege with respect to advice given the executor by an attorney, since the executor was necessarily acting for both itself and the beneficiaries. Finally, at least one court has specifically extended the *Garner* doctrine into the union context. In *Boswell v. International Brotherhood of Electrical Workers Local 164,* 106 L.R.R.M. (BNA) 2713 (D.N.J.1981), the court held that union officers could not assert the attorney-client privilege against a union member with respect to advice from counsel relating to the legality of their conduct toward him because they stood in a fiduciary relationship to the union member. *See also In Re Baldwin-United Corp.,* 38 B.R. 802 (Bankr.S.D. Ohio 1984) (*Garner* doctrine applied to bankruptcy creditors' committee's assertion of attorney-client privilege against creditors). In sum, the *Garner* fiduciary exception to the attorney-client privilege is not based on considerations peculiar to the corporate context. The *Garner* principle thus has been extended to situations far removed from its conventional shareholder litigation origins.

### C. Unions as Fiduciaries

The plaintiffs argue that the *Garner* doctrine applies in the present case because the unions operate as fiduciaries with respect to the union members. The unions respond that the only duty they have assumed is the duty of fair representation, which is far less stringent than a fiduciary duty. The unions point out that their duties vary with the context of their responsibilities. They note that unions have generally been afforded broad discretion in the negotiating context, and that courts have been reluctant to impose liability on unions for the manner in which they negotiate collective bargaining agreements.

While a union's duties may well vary according to context—a union may take quite a different role in a union-processed employee grievance than it does in collective bargaining negotiations—courts have repeatedly characterized the general nature of a union's duty toward its members as fiduciary. For example, in *Grant v. Mulvihill Brothers Motor Service, Inc.*, 428 F.Supp. 45, 46 (N.D.Ill.1976), the court held that a union's "statutory duty of fair representation can be analogized to an agent's fiduciary responsibility to his principal, which entails special duties of care and loyalty." Cases have uniformly held that a union's duty of fair representation is a fiduciary duty, demanding the highest degrees of loyalty and fidelity. *Bloom v. International Brotherhood of Teamsters Local 468*, 752 F.2d 1312, 1316 (9th Cir. 1984); *NLRB v. Local 282, International Brotherhood of Teamsters*, 740 F.2d 141, 147 (2nd Cir.1984); *Lawson v. Truck Drivers, Local Union 100*, 698 F.2d 250, 259 (6th Cir.1983); *Howard v. Aluminum Workers International Union and Local 400*, 589 F.2d 771, 774 (4th Cir.1978); *Deboles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1014 (3rd Cir.1977); *Bures v. Houston Symphony Society*, 503 F.2d 842, 843 (5th Cir.1974); *Waiters Union, Local 781 v. Hotel Association*, 498 F.2d 998, 1000 (D.C.Cir.1974); *NAACP v. Detroit Police Officers Association*, 591 F.Supp. 1194, 1212 (E.D.Mich.1984); *Talley v. United States Postal Service*, 526 F.Supp. 151, 158 (D.Minn.1981); *McConney v. Great Atlantic & Pacific Tea Co.*, 455 F.Supp. 1143, 1147 (E.D.Pa.1978). Defendant unions have cited no cases which stand for the proposition that a union's duties to its members are *not* fiduciary in nature.

The fiduciary nature of a union's responsibilities to its members has not been limited to any particular aspect of the relationship. Instead, the fiduciary duties have been held to extend to the negotiation, administration and enforcement of collective bargaining agreements. *Bazarte v. United Transportation Union*, 429 F.2d 868, 871 (3rd Cir.1970); *Local 4076, United Steelworkers of America v. United Steel-*workers of America, AFL–CIO, 338 F.Supp. 1154, 1161 (W.D.Pa.1972); *Davidson v. International Union United Auto Workers of America, Local No. 1189*, 332 F.Supp. 375, 379 (D.N.J.1971). One court has succinctly stated the ambit of a union's obligations to its members:

> Although the Union must represent factions with diverse and sometimes contradictory demands, it nonetheless owes all of its members a duty of fair representation. This duty is a fiduciary one and the Union's conduct must conform to the high standard demanded of any fiduciary relationship. As collective bargaining agent, it must execute its responsibilities with utmost fairness and good faith, notwithstanding the countervailing demands of its constituents. If the Union is guilty of bad faith and unfair representation, it will have failed to fulfill its responsibilities and will have breached its fiduciary duty.

*Deboles v. Trans World Airlines, Inc.*, 350 F.Supp. 1274, 1287 (E.D.Pa.1972), *aff'd*, 552 F.2d 1005 (3rd Cir.1977).

Magistrate Wooley analogized a union's duties to its members to the fiduciary duties of union officials to their unions imposed by Section 501 of the LMRDA, 29 U.S.C. § 501. The defendants maintain that Section 501 imposes duties on the part of union *officers* and not unions, and that the duties run to the *unions* and not to individual members. But the Court agrees with the plaintiffs' interpretation that Section 501 provides some additional support for the recognition of unions as fiduciaries vis-a-vis their members, since a union can only act by and through its officers and since a union is comprised of its members. The Court rejects as sophistic defendants' argument that the *Garner* rule should not extend to plaintiffs because they are not currently union members, since the very reason plaintiffs are not presently union members is the alleged wrongdoing of the defendant unions.

■ Finally, the application of fiduciary principles to a union's relationship with its

members makes conceptual sense. The union members have placed trust and confidence in the union officials, which reliance has been sustained for a long period of time. There is a certain disparity of positions between the parties, and the union officials maintain a posture of dominance and control. The union members rely heavily on the judgment of the officials. Importantly, the union exercises its authority not for itself but on behalf of its members. *See United States v. Margiotta,* 688 F.2d 108, 125 (2nd Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct..1891, 77 L.Ed.2d 282 (1983) (characteristics of a fiduciary relationship); *United States v. Reed,* 601 F.Supp. 685, 704–07 (S.D.N.Y.1985) (same). In short, union officials' association with their members possesses all the essential characteristics of a fiduciary relationship. Thus, the Court holds that the *Garner* fiduciary exception to the attorney-client privilege applies in the union context.

## D. Good Cause Under Garner

The essential question under *Garner* is whether the plaintiffs have shown "good cause" why the attorney-client privilege should not be invoked by the unions to preclude discovery. "The burden of establishing good cause is upon the party seeking to pierce the attorney-client privilege." *Ohio-Sealy Mattress Manufacturing Co. v. Kaplan,* 90 F.R.D. 21, 31 (N.D.Ill.1980). The Court has examined the nine factors enumerated in *Garner* that bear upon whether "good cause" has been shown.

■ The record before the Court amply demonstrates good cause why the attorney-client privilege should not protect the communications between the union officials and their attorneys. Regarding the numerosity factor of *Garner,* the defendants contend that the plaintiffs represent less than one percent of the current members of the unions. The plaintiffs respond that they represent one hundred percent of the Rodeo union members who were adversely affected by the unions' conduct. In the union context, the Court believes the relevant inquiry is a comparison of the number

of union members who were potentially adversely affected by the unions' actions with the number of union members who were not so affected. *See Panter v. Marshall Field & Co.,* 80 F.R.D. 718, 723 (N.D. Ill.1978). There were 694 persons employed at the Rodeo plant. Dk. no. 130, p. 1. The number of former Rodeo employees who were rehired at the Ark City plant was 194. Dk. no. 130, p. 2. Thus, approximately 500 employees were potentially adversely affected by the unions' conduct. This number represents a substantial percentage of the employees having an interest in the documents in question.

The Court finds that the present suit is brought in good faith and not for purposes of harassment. Further, review of the plaintiffs' allegations and of the documents tendered to this Court for *in camera* inspection indicates that the plaintiffs' claims are "obviously colorable." *Garner,* 430 F.2d at 1104. The plaintiffs' class representatives have a high degree of need for the information sought, since these documents, many of which represent contemporaneous writings, are the most direct and effective means of demonstrating the union's knowledge and intent regarding its activities. *See Cohen,* 80 F.R.D. at 484.

With respect to the fifth *Garner* factor, the complaint alleges several significant instances of wrongful action by the unions—action rendered illegal but not criminal by the federal labor laws. *See Garner,* 430 F.2d at 1104. Many of the communications sought relate to the unions' past conduct and the legal significance of accomplished acts, rather than to prospective conduct still in the sensitive planning stages. *Id.* Furthermore, although the present lawsuit was foreseeable, the documents requested do not concern the instant litigation; the information sought relates to the unions' activities before this litigation commenced.

The documents requested are clearly identified, and the plaintiffs are not blindly fishing for information. The materials are specifically pertinent to the plaintiffs' claims. *Id.* Finally, the Court finds there is no risk of revelation of trade secrets or

other confidential information. In sum, the plaintiffs have satisfied *all* of the *Garner* factors and have established "good cause" why the attorney-client privilege may not be invoked by the unions.

### E. Application of Garner Principles to the Work Product Doctrine

■ Applying the *Garner* criteria, some courts have restricted discovery in instances where the communication related to the litigation itself, i.e., constituted work product. *See In Re International Systems and Controls Corporation Securities Litigation,* 693 F.2d 1235 (5th Cir.1982); *Donovan v. Fitzsimmons,* 90 F.R.D. 583 (N.D. Ill.1981). This Court specifically rejects a work product "exception" to *Garner,* since *Garner* itself made clear that whether the documents consisted of advice pertaining to the pending litigation was only one indicium of good cause. *See Ohio-Sealy,* 90 F.R.D. at 31. One commentator has carefully analyzed why there should be no work product exception to *Garner:*

> The rationale underlying *Garner* leads inevitably to the conclusion that the test for the discovery of all relevant "work product" is whether there is "good cause" for its production. It is logically inconsistent to deny discovery of any documents denominated as "work product" which long antedate the suit at hand, for such documents confirm the anticipation of ... litigation far prior to suit and presumptively contain strong evidence of a company's scienter with respect to alleged violations of the ... laws.... Whether or not the interests of shareholders and corporate management diverge by the time shareholders' suits become imminent, it is clear that it is the shareholders who pay for counsel which corporate management hires to defend itself. Thus, any oversimplistic notion that "work product" is nondiscoverable under *Garner* should be soundly rejected.

Lewis, *supra,* at 212.

■ This Court finds good cause under *Garner* for discovery of the work product protected documents. As the Court explained above, the documents at issue here provide a unique source of evidence with respect to union scienter. Moreover, while the documents were prepared in anticipation of litigation at some future time, they were not developed contemporaneously with the instant case. Therefore, the Court holds that the plaintiffs are entitled to obtain the work product materials under *Garner.*

### IV. THE CRIME OR FRAUD EXCEPTION

Magistrate Wooley also concluded that the crime or fraud exception to the attorney-client privilege and the work product doctrine applied and made the Morrell documents discoverable. Under the terms of the Magistrate's ruling, the company documents are stripped of the attorney-client and work product privileges because the documents were prepared in the course of the defendant's conduct in committing unfair labor practices. The parties have advanced a number of arguments on the applicability of the crime or fraud exception, one of which the Court finds is dispositive of the issue.

■ Under Kansas law, the attorney-client privilege and work product doctrine do not extend to communications regarding legal services "sought or obtained in order to enable or aid the commission or planning of a crime or tort." K.S.A. § 60–426(b)(1). *See also In Re Grand Jury Proceedings (Vargas),* 723 F.2d 1461, 1467 (10th Cir. 1983). While the plaintiffs must only make a prima facie showing that a crime or fraud has been perpetrated, the plaintiffs may not use as evidence of the crime or fraud the very documents which are sought in discovery. *In Re A.H. Robins Co., Inc.,* 107 F.R.D. 2, 9 (D.Kan.1985). Magistrate Wooley explicitly stated that he relied upon the contents of the documents in making his determination regarding the crime or fraud exception. Dk. no. 149, p. 29. Furthermore, the Magistrate held no evidentiary hearings concerning the crime or fraud exception. Therefore, the Court concludes

that the Magistrate's application of the crime or fraud exception was clearly erroneous and contrary to law. The Court shall remand this portion of the case to the Magistrate with instructions that the Magistrate examine evidence independent of the documents to ascertain whether the crime or fraud exception should apply.

## V. WAIVER OF ATTORNEY–CLIENT PRIVILEGE OR WORK PRODUCT CLAIMS

In the course of the NLRB proceeding, Lee Bishop of Morrell, Eugene Cotton, counsel for the unions, and Lewis Anderson, vice president of the International Union, filed affidavits regarding the August and September of 1982 discussions between the unions and Morrell officials. Furthermore, Bishop had discussions with various union officers. The plaintiffs contend that the defendants' attorney-client privilege and work product doctrine claims are waived as to any subject matter contained in the affidavits or the discussions.

The unions correctly note the flaw in the plaintiffs' argument: nothing said during the discussions or reported in the affidavits was privileged. In order to waive the privilege attaching to a particular communication, or others on the same subject matter, the disclosed communication must itself be privileged. *In Re Sealed Case*, 676 F.2d 793, 809 (D.C.Cir. 1982). The communications at issue here were public bargaining discussions, not confidential communications between an attorney and client. Because the disclosed communications were not privileged, the Court therefore concludes that the defendants did not waive their claims of privilege.

## VI. ACCESS TO THE PROCESS OF SELECTION OF DOCUMENTS

In preparation for the deposition of Darrell Howe, a Morrell employee who was involved in hiring ACPC workers, Morrell counsel showed Howe certain files they assembled. At the deposition, plaintiffs' counsel asked Howe what documents he reviewed prior to the deposition. Morrell objected and instructed Howe not to answer on the grounds of attorney-client privilege and work product doctrine. The files that Howe reviewed had been produced to plaintiffs in response to document requests a year previously. Morrell posited that the process of selecting documents was work product. The Magistrate treated the Howe issue generally under the crime or fraud exception. The Court agrees with Morrell's analysis that the ruling on the Howe issue turns on an interpretation of Rule 612 of the Federal Rules of Evidence and the work product doctrine.

Federal Rule of Evidence 612 provides in pertinent part:

> [I]f a witness uses a writing to refresh his memory for the purpose of testifying, ... (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witnesses thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

Rule 612 is a rule of evidence, not a rule of discovery. *Sporck v. Peil*, 759 F.2d 312 (3rd Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). The purpose of Rule 612 is to allow an adverse party to have access to those writings which have an impact on the testimony of the witness. Fed.R.Evid. 612 advisory committee note. Since the plaintiffs already had possession of the documents, the only purpose for ordering discovery of the documents Howe reviewed would be to inform plaintiffs of the attorneys' process of selection and distillation of documents. Discovery would reveal nothing more than what documents the attorneys thought were relevant to the transactions. As the *Sporck* court held, "Proper application of Rule 612 should never implicate an attorney's selection, in preparation for a witness' deposition, of a group of documents he believes critical to a case." *Id.* at 318. Thus, this Court holds that the process of selecting the Howe documents is protected

by the attorney opinion work product doctrine. Depending upon his resolution of the crime or fraud issue, on remand the Magistrate may consider whether the process of selecting and compiling the documents for Howe to review itself falls within the crime or fraud exception.

## VII. REOPENING THE DEPOSITION OF PHILLIP IMMESOTE

On August 5, 1985, the plaintiffs deposed Phillip Immesote, an official of the unions, during the initial stages of pretrial discovery. Due to the discovery of certain inquiry-provoking documents following this deposition, plaintiffs have moved to reopen the deposition and depose Immesote further regarding these documents. The defendants object that the plaintiffs could have foreseen that the documents would engender questions and could have rescheduled the deposition.

█ This Court believes in permitting liberal discovery to provide both parties with the requisite information for proper litigation on all the facts. *See Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Although it might have been foreseeable that the examination of the requested documents would provoke questions which might have been resolved in an earlier deposition, the Court determines that it would be unduly harsh to penalize the plaintiffs for a lack of prescience by depriving them of necessary discovery. Therefore, the Court finds good cause to grant the plaintiff's motion to reopen the deposition of Phillip Immesote.

## VII. PRIVILEGE CLAIMS ON NEWLY DISCOVERED DOCUMENTS

On July 16, 1986, by way of a letter, defendant unions submitted to this Court eight additional documents unearthed as a result of plaintiff's request for additional documents, which the unions argue qualify for protection under the attorney-client privilege and/or the work-product doctrine. The Court has examined these documents and makes the following findings: documents numbered 1, 4, 5, 6, 7 and 8 are protected by the attorney-client privilege and the work product doctrine; documents numbered 2 and 3 are protected only by the work product doctrine. Under the reasoning in section III above, the Court finds these documents are discoverable by the plaintiffs.

IT IS THEREFORE ORDERED that the motion for review of the Magistrate's order is hereby granted in part and denied in part. The Court affirms the Magistrate's ruling that the union documents are discoverable under the *Garner* rule. The Clerk of the Court is directed to deliver to the plaintiffs the union documents and the eight newly discovered documents two weeks from the date of this Order. The issue of the applicability of the crime or fraud exception to the Morrell documents is hereby remanded to the Magistrate with directions that the Magistrate examine evidence apart from the documents at issue to ascertain whether the plaintiffs have established a prima facie case of crime or fraud. Since the Court determined that the union documents were discoverable independently of the crime or fraud exception, the Magistrate may review those documents with respect to the crime or fraud issue.

IT IS FURTHER ORDERED that the Howe documents are protected from discovery by the attorney opinion work product doctrine. However, on remand, if the Magistrate determines that the crime or fraud exception is apposite, then he may consider whether the exception should apply to the process of selecting the Howe documents.

IT IS FURTHER ORDERED that the plaintiff's motion to reopen the deposition of Phillip Immesote is hereby granted.