Dorothea A. ARCURI, et al., Plaintiffs,

v.

**TRUMP TAJ MAHAL ASSOCIATES,
et al., Defendants.**

Civ. No. 91–3529 (SSB).

United States District Court,
D. New Jersey,
Camden Vicinage.

March 30, 1994.

Richard G. Phillips, Patrick C. Campbell, Jr., Philadelphia, PA, for plaintiffs Arcuri, et al.

Jubanyik, Varbalow, Tedesco, Shaw and Shaffer, Rudi Grueneberg, Cherry Hill, NJ, for plaintiffs.

Goldenberg, Mackler & Sayegh, Harry Goldenberg, Atlantic City, NJ, for plaintiffs Polonsky, et al.

Tomar, Simonoff, Adourian and O'Brien, Theodore M. Lieverman, Haddonfield, NJ, for defendant Local 54 HERE.

Nicholas Francis Moles, Atlantic City, NJ, for defendant, Trump Taj Mahal.

## OPINION

ROSEN, United States Magistrate Judge.

Presently before this court is the motion of Richard G. Phillips, Esquire, attorney for the plaintiffs Dorothea A. Arcuri, et al. (the "Arcuri plaintiffs") for an order compelling discovery from and for the imposition of sanctions upon the defendant Local 54 of the Hotel Employees and Restaurant Employees International Union ("Local 54") for failing to either produce witnesses for noticed depositions, or to seek a protective order preventing their attendance. These two consolidated actions concern the transfer of beverage serving employees to the newly-opening Trump Taj Mahal Hotel and Casino in Atlantic City, New Jersey (The "Taj") in early 1990, from the existing Trump Castle, Plaza and Regency Casinos, and the ensuing seniority disputes which developed between various groups of employees, the employer, and Local 54.[1] Local 54 represents all the beverage serving employees employed at the Trump casinos.

### I. Facts and Procedural History.

The complaint in *Polonsky v. Trump Taj Mahal* was filed on June 10, 1991 in the

---

1. Counsel for Local 54 has characterized these cases as being about "two different groups of employees who are locked in mortal combat over the prize of high seniority numbers. Since one group can only advance to the detriment of the other group, each believes that the other group is engaging in unlawful conduct to take advantage of them." Defendant's Memo, at 10.

Atlantic County Superior Court, and subsequently removed to the District Court. A second amended complaint was filed in *Polonsky* on June 2, 1992. The complaint in *Arcuri v. Trump Taj Mahal* was filed on August 7, 1991, along with a motion for a temporary restraining order to prevent Local 54 from seeking the reopening of a December 8, 1990 arbitration award (the "arbitration" or "arbitration award"). On August 9, 1991 the court granted a temporary restraint, but dismissed the motion following a hearing on August 23, 1991. On December 28, 1992, the *Polonsky* and *Arcuri* matters were consolidated for all purposes.

Following the May 1990 opening of the Taj, plaintiffs have alleged, it refused to recognize the seniority status of the employees transferred from the Trump Regency, and placed them behind employees transferred from the other Trump casinos.[2] In these actions, Local 54 is accused of "breaching the duty of fair representation that [it] owed" to the plaintiffs. The seniority issue of the employees was the subject of arbitration in September 1990 before Richard J. Kasher (the "arbitrator"), who in his December 8, 1990 award, sustained Local 54's grievance, and found that Trump "failed to give proper recognition to the past service credit" of the transferred Regency employees. Defendant's Memorandum of Law in Opposition ("Defendant's Memo"), at 3. The reception to and the acceptability of the arbitration award to the various parties in this matter is disputed, but it appears that there existed certain disagreements. See Defendant's Memo, at 3.

What occurred subsequent to the December 8, 1990 arbitration award, with respect to its implementation, or the failure to implement the award, is seriously in dispute. It is this dispute which provides the foundation for the instant controversies, and the current motion to compel discovery. On December 19, 1990, the United States Department of Justice (DOJ) filed a civil action under the RICO statute against Local 54, its local officials, and officials of its international. *United-*

ed States v. Hanley, et al., Civil No. 90–5017 (D.N.J.). A consent decree between the parties to the DOJ suit was approved by Judge Garrett E. Brown, Jr. on April 12, 1991, and on April 19, 1991, pursuant to the decree, James F. Flanagan, III, Esquire, was appointed to act as monitor for Local 54.

Flanagan subsequently retained Howard S. Simonoff, Esquire, and Robert F. O'Brien, of Tomar, Simonoff, Andourian & O'Brien, as counsel for Local 54.

Central to the dispute in this matter, and to the deposition testimony sought by plaintiffs in this motion to compel, are the questions of whether and when Local 54 and/or its representatives sought to reopen the arbitrator's award, whether Local 54 breached a duty of fair representation to its members, and whether Local 54 sought to prevent or delay the "rebid" of jobs.

The instant motion to compel discovery and for sanctions was filed by the Arcuri plaintiffs on December 22, 1993, seeking the continued deposition of Flanagan, and the depositions of Simonoff and O'Brien. In its opposition filed on January 12, 1994, Local 54 made application for a protective order barring the discovery sought by the plaintiffs.

## II. The Motion to Compel Discovery from Local 54.

The Arcuri plaintiffs have filed this discovery motion in order to compel further deposition testimony from James Flanagan, III, objected to and prevented by counsel at the original Flanagan deposition, and to compel the depositions of Howard Simonoff, Esquire, and Robert O'Brien, Esquire. The plaintiffs seek, in summary, to secure deposition testimony as follows:

*From Howard S. Simonoff, Esquire:* Concerning "his conversations with the Taj employees, officers and agents concerning the Union's request that the Taj refrain from conducting a rebid and the factual and legal basis the Union had for making such requests." Plaintiff's Motion to Compel, at 6.

---

**2.** A February 9, 1990 agreement between Local 54 and the Trump organization, provided that former employees of the Trump Castle, Plaza and Regency would be accorded the highest seniority numbers upon their transfer to the Taj, and would retain their seniority. Defendant's Memorandum of Law in Opposition, January 11, 1994, at 2.

*From Robert F. O'Brien, Esquire:* Concerning "the nature of his investigation into the arbitration, the results of his investigation into the arbitration, the information that he relayed to Flanagan relating either to the nature or the results of his investigation into the arbitration and any doubts that he expressed, to anyone, including, but not limited to, Flanagan, as to the merits of the claims which were causing the Union to reopen the arbitration and/or the doubts expressed by him that if the arbitration was reopened the award would change." Plaintiff's Motion, at 6.

*From James F. Flanagan, III, Esquire:* Concerning "the meaning and/or intent of his April 6, 1992 letter, and to respond to questions about any of the areas" to be inquired into of Simonoff and O'Brien "to which he has knowledge." Plaintiff's Motion, at 6.

In summary, the defendant has objected to the sought deposition testimony on three grounds:

(1) that it is covered by the attorney-client privilege and thus non-discoverable;

(2) that, to the extent any information sought is not privileged, the plaintiff has failed to make the required showing to justify deposition of an adverse counsel, as articulated by the Hon. Jerome B. Simandle in *Johnston Development Group, Inc. v. Carpenters Local Union No. 1578*, 130 F.R.D. 348 (D.N.J.1990); and

(3) that Flanagan's status as court-appointed monitor, and his "adjudicative" efforts as a "quasi-judicial" officer to work out the Arcuri–Polonsky dispute, forbids any inquiry into his "thought processes."

## III. Analysis.

The primacy of defendant's objections to the production of Flanagan, Simonoff and O'Brien, upon the indicated subject matter, is the attorney-client privilege. Additionally, defendant objects on the grounds that plaintiff has not satisfied the requirements articulated in *Johnston Development* to warrant the "extraordinary step of deposing adversary counsel" as to any non-privileged areas of inquiry, and that Flanagan's thought pro-

cesses may not be inquired into as he was acting as a "quasi-judicial" officer.

### A. The Attorney–Client Privilege.

Defendant Local 54 has asserted in its Memorandum of Law in Opposition to this motion ("Defendants Memo") that the testimony which the Arcuri plaintiffs seek to compel, from Flanagan in a continuation of his prior deposition, and from Simonoff and O'Brien in depositions, is protected by the attorney-client privilege.

Discovery in federal courts is governed by Rule 26 of the Federal Rules of Civil Procedure, which provides in part:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, ... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

*Fed.R.Civ.P.* 26(b)(1) (1993). Thus if the testimony sought in these depositions otherwise meets the requirements of Rule 26, and it is "not privileged," it may be obtained in discovery. In determining whether such discovery sought under *Fed.R.Civ.P.* 26 is privileged, we must look first to *Fed.R.Evid.* 501. *See Goldinger v. Boron Oil Co.*, 60 F.R.D. 562 (W.D.Pa.1973), *aff'd*, 511 F.2d 1393 (3d Cir.), *cert. denied*, 423 U.S. 834, 96 S.Ct. 59, 46 L.Ed.2d 52 (1975). This rule reads, in pertinent part, that:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

*Fed.R.Evid.* 501. The rule goes on to provide that where the State law provides the "rule of decision," state law as to privilege shall apply. The "rule of decision" in the instant cases, brought under the court's federal question jurisdiction is, of course, feder-

al, and thus federal law pertaining to privilege applies. *See In re Grand Jury Impaneled January 21,* 541 F.2d 373 (3d Cir.1976); *Slakan v. Porter,* 737 F.2d 368 (4th Cir.1984), *cert. denied sub nom. Reed v. Slakan,* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

 The attorney-client privilege is the oldest privilege recognized under the common law for the protection of confidential communications. *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The privilege is predicated upon the principle that effective representation of clients is in the public interest, and that this is best served by the attorney's being fully informed by the client. The Supreme Court has characterized the purpose of the privilege as to:

> encourage full and frank communication between attorneys and their clients and thereby promote the broader public interest in the observance of law and administration of justice. The privilege recognized that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client.

*Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682; *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980); *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). The existence of the attorney-client privilege fosters a representational environment which is "free from unnecessary intrusion by opposing parties and their counsel." *United States v. Nobles,* 422 U.S. 225, 237, 95 S.Ct. 2160, 2169, 45 L.Ed.2d 141 (1975). The privilege permits the client to both refuse to disclose and to prevent others from disclosing confidential communications, between himself or herself and the legal representative, made in pursuance of or in the facilitation of the provision of legal services to the client. *See, e.g., Handgards Inc. v. Johnson & Johnson,* 413 F.Supp. 926 (N.D.Cal.1976). The privilege, when found to exist, is absolute. *Admiral Insurance Co. v. United States District Court,* 881 F.2d 1486 (9th Cir.1989); *Henson v. Wyeth Laboratories, Inc.,* 118 F.R.D. 584 (W.D.Va.1987).

The Third Circuit has stated that the attorney-client privilege, "long established, ... protects from disclosure the confidential communications made by a client to her lawyer in furtherance of his representation of her." *United States v. Moscony,* 927 F.2d 742, 751 (3d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991), citing S. Stone & R. Liebman, *Testimonial Privileges* § 1.01 at 4 (1983). The federal common law applicable to the attorney-client privilege has been restated in Supreme Court Standard 503 (unpromulgated), in part as:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative....

Supreme Court Standard 503(b) (unpromulgated); *Moscony,* 927 F.2d at 751; J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 503 at 503–1. Wigmore has stated the attorney-client privilege as applying:

> (1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the privilege be waived.

8 *Wigmore on Evidence* § 2292 at 554 (McNaughton rev. 1961). The most frequently cited articulation of the privilege is by Judge Wyzanski:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication related to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal

proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950); *In re Grand Jury Investigation,* 599 F.2d 1224 (3d Cir.1979); *Barr Marine Products Co., Inc. v. Borg–Warner,* 84 F.R.D. 631, 633 (E.D.Pa.1979).

The Third Circuit has held that the attorney-client privilege protects not only the communication between attorney and client, but additionally protects "[l]egal advice or opinion from an attorney to his client." *United States v. Amerada Hess Corp.,* 619 F.2d 980, 986 (3d Cir.1980); *Garner v. Wolfinbarger,* 430 F.2d 1093, 1096 n. 7 (5th Cir. 1970), *cert. denied sub nom., Garner v. First American Life Insurance Co.,* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); *Schwimmer v. United States,* 232 F.2d 855, 863 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956). The court rejected the notion that "the attorney-client privilege was inapplicable to communications from the attorney to the client." *Amerada Hess,* 619 F.2d at 985. The reason for protecting the advice or opinion rendered by the attorney, along with the communication itself, is to prevent "the use of an attorney's advice to support inferences as to the content of confidential communications." *Amerada Hess,* 619 F.2d at 986. *See also United States v. Bartone,* 400 F.2d 459, 461 (6th Cir.1968), *cert. denied,* 393 U.S. 1027, 89 S.Ct. 631, 21 L.Ed.2d 571 (1969).

Since, the Third Circuit has noted, "the privilege obstructs the search for the truth and because its benefits are, at best, 'indirect and speculative,'" the attorney-client privilege must "be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *Barr Marine,* 84 F.R.D. at 633–34, quoting *In re Grand Jury Investigation,* 599 F.2d at 1225 (quoting 8 *Wigmore on Evidence* § 2291 at 554 (McNaughton rev. 1961)). The communication at issue, for example, *must* be between the attorney and the client, "[t]hus, a communication between the attorney and any third party not the client is not privileged even if the information contained therein is then conveyed by the attorney to the client." *Barr Marine,* 84 F.R.D. at 634; *United Shoe Machinery,* 89 F.Supp. at 359; *Tutson v. Holland,* 50 F.2d 338, 340 (D.C.Cir.), *cert. denied,* 284 U.S. 632, 52 S.Ct. 21, 76 L.Ed. 538 (1931).

For the privilege to apply, the attorney must "acting as an attorney and not, *e.g.,* as a business advisor." *Barr Marine,* 84 F.R.D. at 634. "[A]ttorneys do not " 'act as lawyers' when not primarily engaged in legal activities." *Id.,* quoting *Zenith Radio Corp. v. Radio Corp of America,* 121 F.Supp. 792, 794 (D.Del.1954). "The key is that communications must be primarily legal [although] the privilege is not necessarily lost when non-legal information is part of a communication seeking or giving legal advice." *Barr Marine,* 84 F.R.D. at 635; *United Shoe Machinery,* 89 F.Supp. at 359.

■ The burden of establishing the existence of the privilege belongs to the party asserting the privilege. *In re Grand Jury,* 603 F.2d 469, 474 (3d Cir.1979); *Wei v. Bodner,* 127 F.R.D. 91, 94 (D.N.J.1989), *citing Brock v. Gerace,* 110 F.R.D. 58 (D.N.J.1986); *United States v. Tratner,* 511 F.2d 248, 251–52 (7th Cir.1975).

The Arcuri plaintiffs seek through their motion to compel the depositions of Local 54's attorneys, Simonoff and O'Brien, to:

inquire into the conversations between union counsel and Flanagan concerning the investigation into the Polonsky charges, and the consultation between union counsel and Flanagan about whether the union should attempt to reopen the arbitration.

Plaintiff's Memorandum ("Plaintiff's Memo") in Support, at 7. The plaintiffs in their discussion of the privilege assert that where "the communications are from the attorney to the client, and not the other way around" the privilege does not apply. Plaintiff Memo, at 8–9. While plaintiff agrees that "the attorney-client privilege is designed to encourage the client to make full disclosures to the attorney," plaintiff goes on to assert that "the focus is on what the client told the attorney, not what the attorney told the client," and that "[t]he attorney's communica-

tion to the client should be privileged only to the extent that they reveal communication from the client to the attorney." Plaintiff's Memo, at 8.

█ In support of this line of argument, the plaintiff relies entirely upon *United States v. I.B.M.*, 66 F.R.D. 206 (S.D.N.Y. 1974), while failing to address relevant, controlling Third Circuit case law. As discussed above, the Third Circuit in *Amerada Hess* has held that the privilege covers substantially more than simply what the client tells his or her attorney. To the contrary, it covers the attorney's provision of an opinion or the giving of advice, and, by necessity, the communication *between* the client and the attorney to prevent "the use of an attorney's advice to support inferences as to the content of confidential communications." *Amerada Hess*, 619 F.2d at 986.

The rendition of an opinion or advice by an attorney within the scope of the privilege is a far more complex process than counsel for the plaintiffs seems to believe. To assert that the privilege protects only one side of the communication process between a client and his or her attorney, that from client *to* attorney, is to ignore the practicalities of the communication process, to eviscerate a client's ability to seek meaningful "counsel" from the attorney, and to tie the hands of the attorney by prohibiting any effective dialogue within the confines of the attorney-client relationship. As the Supreme Court has recognized, the communication protected by the privilege is a two way street, with the intent being to "encourage full and frank communication *between* attorneys and their clients." *Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682 (emphasis added).

In these consolidated cases, Mr. Flanagan, appointed by the court as monitor for the union, engaged Messrs Simonoff and O'Brien as counsel for Local 54. As such, both Local 54 and Flanagan are the clients of Simonoff and O'Brien. The thrust of the information sought via the desired depositions of Simonoff and O'Brien is the conduct of Local 54 and/or monitor Flanagan with regard to (1) the implementation of the arbitration award, (2) the rebid (or the refrain from the rebid) of jobs, and (3) any decision made regarding the reopening of the arbitration; what Flanagan and/or Local 54 knew and what lead to certain decisions or actions taken regarding the above issues. In the interest of reaching this information, plaintiffs argue that it is necessary to delve into "investigations" performed by attorneys Simonoff and O'Brien.

Plaintiffs seek from O'Brien details of his investigation into the arbitration, of information passed on to Flanagan, and about "doubts that he expressed" regarding the "merits of the claims which would cause the Union to reopen the arbitration" or as to whether "if the arbitration was reopened the award would change." From Simonoff, plaintiffs seek information regarding his conversations with Taj employees relating to "the Union's request that the Taj refrain from conducting a rebid."

Plaintiffs argue, as to O'Brien, that "[t]here can be no question but that the information learned during O'Brien's investigation, and the results communicated to Flanagan are not protected by the privilege," as (1) "the information does not involve any 'advice,'" (2) "the communications are from the attorney to the client, and not the other way around," and (3) "in conducting and reporting on the investigation, [he] was acting as an investigator, not an attorney." Plaintiffs' Brief, at 8–9.

### 1. Plaintiffs' Assertion That Communications From Attorney To Client Is Not Privileged.

Defendants correctly point out, in this court's view, and as already discussed, the privilege is not a one-way street, and communications *between* attorney and client are protected when engaged in for the purpose of soliciting and/or providing opinion and advice. The privilege protects the entirety of the communicative process between the client and the attorney, in both directions, when it is engaged in to facilitate the client's seeking of advice and the attorney's provision of advice. To argue that the privilege only protects the client's initial query, and none of the further communications *between* the attorney and the client as the attorney endeavors to arrive at an adequate response for his

client, is a simplistic and illogical view, and is rejected by this court.

### 2. Plaintiffs' Assertion That O'Brien Was Not Acting As An Attorney.

Plaintiffs also argue that O'Brien was not acting as an attorney when he performed his "investigation," and that "by the very nature of the suit, the Plaintiffs are entitled to inquire into information which the Union decision makers had when it made the decisions at issue." Plaintiffs' Memo, at 9. However, asserts the defendant, "the purpose of meeting with the various Union members was for the purpose of providing legal advice to the Union in a pending dispute." Defendant's Memo, at 20. If, argues defendant, the intent is to inquire into the "facts" which may have informed Flanagan's decisions, "no privilege prevents Arcuri from asking Flanagan." Defendant's Memo, at 21. Defendant notes that questions such as these were asked at Flanagan's deposition. *Id.*

### 3. Plaintiffs' Assertion That The Communications Are Not Privileged Because They Did Not Involve Advice.

■ Plaintiffs' in their motion have asserted, simply, that the communication at issue between O'Brien and Flanagan "does not involve any 'advice.'" Plaintiff's Memo, at 8. There is no substantiation of this, and no discussion of the basis for this assumption. However, as has already been discussed, the ambit of the privilege's protection extends further than suggested by plaintiffs' arguments. Again, communications engaged in for the purpose of obtaining and providing "advice" or "opinion" are protected, and may, on the attorney's part, constitute something more than telling the client "do this" or "don't do that." In this court's view, where an attorney, pursuant to inquiries by a client, engages in an investigation, the purpose of which is to provide a basis for responding to the client's queries, and then discusses with the client the investigation, this communication falls within the attorney-client privilege. It would be extraordinarily difficult to separate, in such a situation, the attorney's discussion with his client relating to any cold, hard "facts" which might be interspersed in

such a discussion from the privileged content. And again, as suggested by the court in *Amerada Hess,* if the revelation of part of the communication would lead to an inference as to the confidential content of the communication, it too should come under the protection. 619 F.2d at 986. It is far more appropriate under these circumstances, when seeking the factual content underlying the communication, to seek these from the client, in this case from Flanagan, than to do so from the attorney and risk the very real danger of intruding upon the confidential communication.

### 4. Plaintiffs' Assertion That Flanagan Has Waived The Privilege By Relying On Advice Of Counsel.

Plaintiffs further argue that since "Flanagan claims to have relied to an extent on the information he learned from O'Brien ... that information has been placed at issue in this suit, and to the extent any privilege applies, it has been waived." Plaintiffs' Memo, at 9. But, as defendant notes, if this is reliance upon "information" per se, and not the advice or the communication with counsel, the confidential communication has not been put in issue, and thus confidentiality is not waived. The plaintiffs are free to depose, and have deposed, Flanagan about the information upon which he relied in making his decisions. That Flanagan may have or did rely upon advice and information provided by counsel, and, *arguendo,* has testified as to the underlying facts, does not waive the attorney-client privilege. Flanagan's revelation, if any, in his testimony about the confidential content of the communications could have the potential for waiving the privilege.

### 5. Plaintiffs' Assertion That The "Bad Faith" Claim Against Local 54 Entitles Plaintiffs to Inquire Into Counsel's Advice.

Since, argue the plaintiffs, there is a claim of bad faith against Local 54, "the Plaintiffs are entitled to know what Flanagan knew when he made his decision in order to determine whether the conduct was in bad faith." Plaintiffs' Memo, at 9. Plaintiffs also argue that if counsel provided advice to Flanagan

which "expressed doubt that the evidence was sufficient to warrant a new arbitration award," and that "in the face of those doubts" Flanagan nonetheless proceeded "expos[ing] the Arcuri Plaintiffs to the harm to which they were exposed," they are entitled to discovery of that advice of counsel. Plaintiff's Memo, at 9–10. Plaintiffs, again, fail to provide any legal support for their argument.

■ Defendant argues that the privilege "is not a balancing test or a bursting bubble. If the privilege exists, the communication is not discoverable, no matter how much the opposing party may want to know it." Defendant's Memo, at 23. Defendant is correct. The attorney-client privilege, if an when attached to a communication (and excepting, of course, a valid waiver), is absolute, and there is no "balance" to be "tested," and no "needs" test, as might be the case with a qualified privilege.

### 6. The "Fiduciary Exception" to the Attorney–Client Privilege.

■ At oral argument on February 4, 1994, counsel for plaintiffs raised a new issue for the first time in support of their motion to compel testimony to which the attorney-client privilege has been asserted. Counsel asserted that the testimony which they seek from Simonoff and O'Brien, withheld under the attorney-client privilege, was discoverable under the so-called, "Garner exception," articulated in Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir.1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971).

In Garner, the Fifth Circuit determined that in stockholder derivative suits, communications between corporate management and their corporate attorneys are not necessarily privileged. Since the corporation owes a fiduciary duty to its shareholders, the court reasoned, it has a "mutuality of interest" with its shareholders in those same communications. So long as the shareholders can demonstrate "good cause" for disallowing the privilege, the communications are not privileged. Garner, 430 F.2d at 1103–1104.

The court then listed nine factors which it felt should be considered in determining whether good cause exists:

(1) The number of shareholders and the percentage of stock they represent;

(2) The bona fides of the shareholders;

(3) The nature of the shareholders' claim and whether it is obviously colorable;

(4) The apparent necessity or desirability of the shareholders having the information and the availability of it from other sources;

(5) Whether, if the shareholders claim is of wrongful action by the corporation, it is of action criminal or illegal or not criminal but of doubtful legality;

(6) Whether the communications relate to past or prospective actions;

(7) Whether the communications are of advice concerning the litigation itself;

(8) The extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and

(9) The risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

Garner, 430 F.2d at 1104. This list is illustrative, rather than exhaustive. The Garner court made clear that not all of these criteria must be met, that none of them are individually dispositive of the issue, and that there may be other criteria which a given court might deem fit to consider. Id.

The court's holding in Garner has been adopted and extended by other courts to other contexts in which one party wishes to invoke the privilege against another party to whom it owes a fiduciary duty. See, e.g., Dome Petroleum, Ltd. v. Employers Mutual Liability Ins. Co. of Wisconsin, 131 F.R.D. 63 (D.N.J.1990) (insurance subrogor/subrogee); Aguinaga v. John Morrell & Co., 112 F.R.D. 671 (D.Kan.1986) (union management/members); Quintel Corp. v. Citibank, 567 F.Supp. 1357 (S.D.N.Y.1983) (bank as fiduciary for land purchase deal/stockholder in purchasing company); Donovan v. Fitzsimmons, 90 F.R.D. 583 (N.D.Ill.1981) (pension fund/beneficiary); Valente v. PepsiCo,

68 F.R.D. 361 (D.Del.1975) (majority stockholder/minority stockholder).

In this case, as in *Aguinaga*, the purported fiduciary relationship is that between a union and its membership. The Arcuri plaintiffs claim that the union has breached its duty of fair representation. Assuming, *arguendo*, that this is true, and that *Garner* applies, Arcuri must still demonstrate good cause to pierce the privilege. Nevertheless, three questions must be addressed in ascertaining whether the otherwise privileged testimony of the union attorneys may be compelled under the *Garner* exception.

First, this court must determine whether the *Garner* exception applies at all in this circuit, and more particularly whether it applies to unions. If so, the court must then decide whether a sufficient fiduciary relationship exists between the parties for the exception to apply. Finally, the court must determine whether Arcuri has shown good cause for the court to invoke the exception.

While the Third Circuit itself has yet to address the *Garner* exception, it has been recognized and applied a number of times in the District of New Jersey and the Eastern District of Pennsylvania. *See, e.g., Dome Petroleum Ltd. v. Employers Mutual Liability Insurance Co.*, 131 F.R.D. 63 (D.N.J. 1990); *In re Sunrise Securities Litigation*, 130 F.R.D. 560 (E.D.Pa.1989); *Boswell v. International Brotherhood of Electrical Workers*, 1981 WL 27188 (D.N.J.1981); *Cohen v. Uniroyal*, 80 F.R.D. 480 (E.D.Pa. 1978); *Valente v. PepsiCo*, 68 F.R.D. 361 (1975).

The court in *Dome* found the *Garner* analysis to be helpful in resolving situations in which a court is called upon to question "the suitability of the attorney-client privilege where common interests are involved," for example, in *Dome*, as between an insurance subrogor and the subrogee. *Dome*, 131 F.R.D. at 68–69.

In *Boswell*, as here, the action was based on an alleged breach of fiduciary duty by a union toward a member. In his brief opinion, Judge Lacey applied the *Garner* exception to permit discovery of communications between the union and its counsel relating to the legality of their conduct toward the plaintiff. While not dispositive of this case, it is certainly instructive.

Counsel for the union correctly points out that no appellate court, including the Third Circuit, has applied *Garner* in the context of labor organizations. At least one circuit, while accepting *Garner*, has expressly limited its holding to shareholder derivative suits. *Weil v. Investment Indicators, Research and Management, Inc.*, 647 F.2d 18 (9th Cir. 1981). However, since the Third Circuit has as yet remained silent, this court must make its own determination as to how to proceed under the *Garner* exception. The district courts of this circuit have clearly expanded the doctrine well beyond the boundaries of *Garner*. The *Boswell* court in particular applied it to the union context. This seems to be the correct approach.

There are other fiduciary duties beyond that which a corporation owes its shareholders. In *Valente*, the corporation's management was required to divulge communications to the minority shareholders, even though to do so was directly inimicable to the interests of the majority shareholders. 68 F.R.D. at 361. In *Sunrise Securities*, the court, applying *Valente*, found that a law firm could not keep its communications with inhouse counsel confidential when those communications were in conflict with its duties to clients. 130 F.R.D. at 597. In *Boswell*, Judge Lacey found a similar relationship between a union and its membership. 106 L.R.R.M. (BNA) at 2713.

This court finds that the relationship between a union and its members, as a general proposition, is properly subject to an analysis under the *Garner* exception.

Central to any application of the *Garner* exception is the question of whether the party opposing discovery had a fiduciary obligation to the party seeking discovery. If so, the rationale follows that the privilege invoked applies to both parties. *Garner*, 430 F.2d at 1103. Where "the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy against the other." *Id.*

The *Garner* "doctrine" "attempts to balance the extent of shareholder interests in a suit and the likelihood of harm to those interests against the harm to management flexibility." *Aguinaga v. John Morrell & Co.*, 112 F.R.D. 671, 677 (D.Kan.1986). The court explained:

> On the one hand, management is under a legal obligation to serve the best interests if the corporation, and since the corporation is owned by its stockholders, it would seem anomalous to deny stockholders access to information ostensibly gathered for their own ultimate benefit. On the other hand, the complete removal of the attorney-client privilege from the grasp of the corporate client (based on the supposed identity between a corporation and its stockholders) ... would expose corporations to harassment suits by minority stockholders and a possible deterioration of candid attorney-client communication and effective corporate management.

*Aguinaga*, 112 F.R.D. at 677 (quoting *Cohen v. Uniroyal*, 80 F.R.D. at 483).

In *Aguinaga*, the district court applied Garner's balancing test to the union context, finding that unions, generally act as fiduciaries for their members. *Aguinaga*, 112 F.R.D. at 679. "[U]nion officers [can] not assert the attorney-client privilege against a union member with respect to advice from counsel relating to the legality of their conduct toward him because they stood in a fiduciary relationship to the union member." *Id.*, citing *Boswell*, 1981 WL 27188. The court found that the *Garner* exception "is not based on considerations peculiar to the corporate client [and] has been extended to situations far removed from its conventional shareholder litigation origins." *Aguinaga*, 112 F.R.D. at 679.

The circuit courts have uniformly upheld the view that the union's duty of fair representation is a fiduciary responsibility. *See, e.g., Bloom v. International Brotherhood of Teamsters Local 468*, 752 F.2d 1312 (9th Cir.1984); *NLRB v. Local 282, International Brotherhood of Teamsters*, 740 F.2d 141, 147 (2nd Cir.1984); *Lawson v. Truck Drivers, Local Union 100*, 698 F.2d 250, 259 (6th Cir.1983); *Howard v. Aluminum Workers*

*International Union and Local 400*, 589 F.2d 771, 774 (4th Cir.1978); *DeBoles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1014 (3rd Cir.1977); *Bures v. Houston Symphony Society*, 503 F.2d 842, 843 (5th Cir.1974); *Waiter's Union, Local 781 v. Hotel Association*, 498 F.2d 998, 1000 (D.C.Cir.1974). A union's "statutory duty of fair representation can be analogized to an agent's fiduciary responsibility to his principal, which entails special duties of care and loyalty." *Grant v. Mulvihill Brothers Motor Service, Inc.*, 428 F.Supp. 45 at 46 (N.D.Ill.1976)

The courts of this circuit have repeatedly held that this duty extends to the negotiation, administration and enforcement of collective bargaining agreements. *See, e.g., Bazarte v. United Transportation Union*, 429 F.2d 868, 871 (3rd Cir.1970); *Local 4076, United Steelworkers of America v. United Steelworkers of America, AFL–CIO*, 338 F.Supp. 1154, 1161 (W.D.Pa.1972); *Davidson v. International Union United Auto Workers of America, Local No. 1189*, 332 F.Supp. 375, 379 (D.N.J.1971).

The *Aguinaga* court found that the application of fiduciary principles to a union's representation of its members "makes good sense." *Aguinaga*, 112 F.R.D. 680–81. The court explained that:

> The union members have placed trust and confidence in the union officials, which reliance has been sustained for a long period of time. There is a certain disparity of positions between the parties, and the union officials maintain a posture of dominance and control. The union members rely heavily on the judgment of the officials. Importantly, the union exercises its authority not for itself but on behalf of its members.

*Id.*, citing *United States v. Margiotta*, 688 F.2d 108, 125 (2nd Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

As a general rule, then, unions are fiduciaries for their members with a positive duty of fair representation. In the instant case, the Arcuri plaintiffs are members of the defendant union, and they have alleged that the union has breached its duties toward them.

The Arcuri plaintiffs, thus, according to the foregoing discussion, are entitled to invoke the *Garner* exception as developed in *Aguinaga* and *Boswell.* The *Garner* exception, this court holds, under the facts and circumstances of this case, applies.

■ What remains prior to this court's being able to determine whether the *Garner* exception permits the plaintiffs here to pierce the attorney-client privilege, is the application of the balancing, or "good cause" test which *Garner* requires. The first two threshold questions in a complete analysis under *Garner* are simply questions of law which have already been answered. First, whether courts in this circuit permit application of the *Garner* exception in the union context: they do. Second, whether a union is a fiduciary for its members: it is.

The final question that must be addressed is whether the party seeking discovery can show "good cause" for the court for piercing the attorney-client privilege. Although a "good cause" analysis is ordinarily not a part of the analysis applicable under the attorney-client privilege, ordinarily an absolute privilege, this good cause can be thought of as being analogous to the showing which is required to breach an otherwise qualified privilege.

Unlike two equal parties using the same counsel, the members of a union are generally considered subordinate to the officials of the union. *Aguinaga* at 681. The baseline for determining whether the *Garner* exception should apply is whether the judgement of the party opposing discovery, here, the union's management, "must stand on its merits, [rather than] an ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is, at least in part, exercised." *Cohen v. Uniroyal, Inc.,* 80 F.R.D. 480, 484 (E.D.Pa. 1978), quoting *Garner,* 430 F.2d at 1101. The burden of establishing good cause falls on the Arcuri plaintiffs as the party seeking to pierce the attorney-client privilege. *Aguinaga,* 112 F.R.D. at 681, citing *Ohio–Sealy Mattress Manufacturing Co. v. Kaplan,* 90 F.R.D. 21, 31 (N.D.Ill.1980).

The court in *Aguinaga* applied each of the *Garner* factors in determining that the plain-

tiffs had good cause to pierce the privilege. *Aguinaga,* 112 F.R.D. at 681–82. While *Garner* neither requires that all of the listed factors be met, nor precludes the use of other factors, I believe that their application is illuminating.

The *Aguinaga* court was faced with arguments very similar to those before this court. As here, the plaintiffs comprised only a fraction of the total membership. Local 54 makes much of this factor in its memo, citing a Fifth Circuit case which denied a shareholders' group which held 4% of the company's stock the right to pierce the privilege. Defendant's Brief at 11, citing *Ward v. Succession of Freeman,* 854 F.2d 780 (5th Cir. 1988). Such an argument based solely on raw numbers is unconvincing. Despite defendant's to the contrary, *Ward* was not decided on the basis of the size of its plaintiff class. The court in *Ward* simply mentions the size of the shareholders group as part of its analysis, but there is no indication that it relied heavily upon this particular aspect. That particular shareholders group happened to have been a small group which failed, in totality, to show good cause.

As the court in *Ward* also acknowledges, the *Garner* factors is "a non-exclusive list of indicia that 'may contribute to the decision of presence or absence of good cause.'" *Garner,* 430 F.2d at 784. Thus, even a single plaintiff may pierce the attorney-client privilege if he is in a fiduciary relationship with the defendants and if he can show good cause on grounds other than numerosity. This was exactly the case in *Boswell:* a single plaintiff was allowed to pierce the privilege held by the management of his union. 1981 WL 27188.

In *Aguinaga,* the plaintiffs argued that while they comprised less than one percent of the membership, they also constituted one hundred percent of the members adversely affected by the union's decision. The court found the relevant inquiry to be a comparison of the number of members potentially affected with the number not so affected. *Aguinaga,* 112 F.R.D. at 681. *See also Panter v. Marshall Field & Co.,* 80 F.R.D. 718, 723 (N.D.Ill.1978). Here the plaintiff makes

the same argument, that is, nearly all of the adversely affected are members of its class.

Counsel for the union characterizes the balancing test in *Aguinaga* as defective. It points out that court arbitrarily excluded 194 people rehired at a lower wage from the "potentially adversely affected group." However, the court in *Aguinaga* did take these 194 into consideration, included them in the group "not so affected", and balanced their total numbers against the plaintiff seeking to pierce the privilege. The court then concluded that the plaintiff had make the requisite showing of good cause, and permitted the discovery. Had the court included them in the affected class, it would only have strengthened the plaintiff's case.

In this case, though, adding the members of both the Arcuri Group and the Polansky group produces a number equal to approximately 5% of the total number of Trump's Taj Majal employees represented by Local 54. Thus the number adversely affected by any calculation is minuscule when compared to the number not so affected. As such, the plaintiffs can not demonstrate good cause based simply on the size of the class.

Similarly, I am unmoved by the plaintiff's blanket statements that it is acting in good faith, that its claims are colorable, that the information relates to illegal activities by the union, and that it relates only to past conduct. Plaintiffs' Letter Brief, February 21, 1994, at 5–6. Assuming, *arguendo*, that all of this were true, I would still remain unconvinced that the plaintiffs have demonstrated the necessity or desirability of obtaining the information and its lack of availability from other sources. *See Garner*, 430 F.2d at 1104. In their memorandum of law, the plaintiffs attempt to meet this burden of showing good cause in a single paragraph:

> The record before this Court amply demonstrates good cause why the attorney-client privilege should not protect pre-litigation communications between Union officials and their attorneys. Regarding the numerosity factor, nearly 100% of the Union members who were adversely affected by the Union's conduct are members of the Arcuri plaintiff group. There is no question but that the suit has been brought in

good faith and that the Arcuri plaintiffs' claims are colorable.... There is a high degree of need for the requested discovery as, among other things, it relates to the Union's state of mind and the discharge of its investigatory obligations. All of the requested discovery relates to illegal and wrongful action by the Union. All of the perspective conduct or communications specifically relating to this litigation.

See also the discussion, *infra*, in the section of this opinion which addresses the depositions of adverse counsel on non-privileged grounds. As noted therein, this court concludes that the plaintiffs have failed to demonstrate a particularized need for these materials, nor that these materials are not readily available from alternative sources.

Unlike shareholders in a derivative suit, there is no mutuality of interest between different factions of a union. As the defendants have noted in their brief, union members frequently "have radically different and conflicting interests on the job." By necessity, the union's executives must have the ability to act on behalf of the union as a whole, even (or especially) where this does not always comport with everybody's interests. To hold otherwise would result in the union's virtual paralysis of decision-making. Unless those seeking to pierce the attorney-client privilege can show some wrongdoing by the union, or a much more particularized need for the information, in order to show such wrongdoing, even under *Garner*, this court is extremely reluctant to strip the privilege from communications between union management and counsel. In theory, this should promote the fiduciary relationship, because it allows the executives to freely confer with counsel and act accordingly to the union's benefit. Only if the plaintiff members can show that these conversations related instead to actions taken to the detriment of the union's fiduciary duty can discovery, in the face of the attorney-client privilege, be had. That has not been the case here.

For the foregoing reasons, this court finds that while *Garner* has been held by the district courts in this circuit to apply to unions in this circuit, the plaintiff here has failed to meet its burden of demonstrating

the good cause contemplated by *Garner* to pierce the attorney-client privilege.

### B. Depositions of Adverse Counsel on Non–Privileged Matters.

Plaintiffs have argued that under the Hon. Jerome B. Simandle's opinion in *Johnston Development Group, Inc. v. Carpenters Local Union No. 1578, et al.,* 130 F.R.D. 348 (D.N.J.1990), "there is no prohibition against obtaining a deposition of adverse counsel regarding relevant, non-privileged information." Judge Simandle, in *Johnston,* discusses at length the circumstances under which the testimony of an adverse attorney may be compelled, and the balancing which must be undertaken in making the determination— but the focus of the attorney testimony contemplated in *Johnston* is not adequately dealt with by the plaintiffs. In *Johnston,* a case brought under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.,* defendants sought to take the depositions of several of plaintiffs' attorneys. The distinction between *Johnston* and this case, one which plaintiffs note but fail to address, is that *Johnston* dealt exclusively with the depositions of adversary attorneys who were also fact witnesses to the subject matter of the sought depositions.

In *Johnston,* as noted in plaintiffs' memo, the attorneys' testimony was to deal with the disputed occurrences at a number of meetings which were attended by the attorneys. The testimony which the attorneys were to provide concerning the meetings was felt to be unavailable elsewhere, and testimony from the few others present at the meetings were conflicting and contradictory. *Johnston,* 130 F.R.D. at 354. Additionally, the court found that one subject communication was placed at issue, and the privilege waived, by the client's act of revealing its content. *Id.* Although plaintiffs have alleged that just such a waiver has occurred in the instant case, by Flanagan's allegedly claiming that he "relied to an extent on the information he learned from O'Brien," Plaintiffs' Memo, at 9, this argument is specious. Under the plaintiffs' waiver analysis, the attorney-client privilege might be waived any time a client defers to an attorney's judgment in matters

legal about which the client is uninformed, simply by acknowledging that he has received and acted (or failed to act) upon his attorney's advice. Such an interpretation of waiver would make a shambles of the privilege.

Finally, as to the "meat" of the *Johnston* opinion, there is no indication in this instant case that attorneys O'Brien and Simonoff are fact witnesses; in actuality, from all the information at hand, and from the characterizations of their actions by both plaintiffs and defendant, they are anything *but* fact witnesses. They are, in actuality, witnesses to nothing. The only testimony which O'Brien and Simonoff could provide, beyond the specific opinion and advice provided to their client, would be the content of interviews with members of Local 54. Such interviews, part of the process in which they engaged in the interest of providing legal advice and opinion to their client, does not function to transform O'Brien and Simonoff into fact witnesses from which *Johnston might* permit depositions into non-privileged matters. Also, any interviews conducted by O'Brien and Simonoff of union members would be, quite clearly, hearsay under no exception, and inadmissible under the rules. Any information which O'Brien and Simonoff might be able to provide, as a consequence of their interviews of union members, which may have "fed" somehow into Flanagan's decision-making process, is available from two alternative, duplicate sources: from Flanagan himself, and from the Local 54 members directly.

### C. Deposition of Flanagan as "Quasi–Judicial" Officer.

■ Finally, the defendant argues that Flanagan's status as court-appointed monitor, and his "adjudicative" efforts as a "quasi-judicial" officer to work out the Arcuri–Polonsky dispute, forbids any inquiry directly from him into his "thought processes." Defendant argues here that since Flanagan was appointed as a receiver for the union, under *Fed.R.Civ.P.* 66, and that he conducted a hearing in that capacity which led to his April 6, 1992 decision, that he is a "quasi-judicial officer" who is "not subject to inquiry

about the reasons for [his] decision." Defendant's Memo, at 35.

Defendant cites various United States Supreme Court, Circuit and District Court decisions as support for this proposition, and indeed, in certain circumstances "inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (citing *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)). The relevant cases which discuss the "deliberative process," and the thoughts and views and considerations which serve to inform this process, are distinguishable in a number of ways however, from the instant case. Principally, these cases deal with the deliberations and the decisions of administrative agencies and their officers, such as the Secretary of Agriculture, in *Morgan;* the Secretary of Transportation, in *Volpe;* the members of the Federal Communications Commission, in *United States v. American Telephone and Telegraph Co.*, 524 F.Supp. 1381 (D.C.D.C.1981); the National Labor Relations Board, in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); or the Environmental Protection Agency, in *EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). As the court in *United States v. AT & T* noted that:

> questions which tend to probe the mental processes of the individual members of the Federal Communications Commission, calling either for the reasons underlying various decisions of the Commission or for their understanding of what these decisions meant ... are part of the agency's deliberative process and as such are clearly privileged.

524 F.Supp. at 1386–87.

This privilege, the Supreme Court has held, exists because "disclosure of intra-agency deliberations and advice is injurious to the government's consultive function because it would tend to inhibit the frank and candid discussion that is necessary for an effective operation of government." 524 F.Supp. at 1387 (citing *EPA v. Mink* and *NLRB v. Sears*). Similarly, courts have also had occasion to hold that "there is no legal basis for

the questioning of an arbitrator in order to investigate the reasons behind the decision." *Wood v. General Teamsters Local Union, Local 406*, 583 F.Supp. 1471, 1473 (W.D.Mich.1984) (citing *Reichman v. Creative Real Estate Consultants*, 476 F.Supp. 1276, 1284 (S.D.N.Y.1979); *Fukaya Trading Co. v. Eastern Marine Corp.*, 322 F.Supp. 278, 279–80 (E.D.La.1971)).

In *Wood*, plaintiffs, employees not re-hired after the sale of their employer's company, alleged that the union had breached its duty of fair representation in failing to protect their seniority and other rights under the collective bargaining agreement, sought the testimony of the arbitrator regarding "the arbitration proceeding the participation of plaintiffs and their lawyers and the reasons for his decision." 583 F.Supp. at 1473, n. 3. The court denied the plaintiffs' motion to question the arbitrator about his decision, holding that "[a]rbitrators would be subject to almost constant harassment if courts allowed them to be called as witnesses" for the purpose of explaining their decisions. 583 F.Supp. at 1474.

The position of Flanagan with regard to the hearing in question, and in regard to his position in this case as a whole, is, this court finds, entirely distinguishable from that in the cases discussed and cited above. Contrary to being an uninvolved third party, seeking to apply rules and regulations and statutes in the adjudication of disputes, as one might color the actions of governmental administrative agency officials and other "quasi-judicial" officers, including arbitrators, Flanagan, as the union monitor, court-appointed as he was, serves a different function. The union monitor's function is to proactively assert the best interests of the union and its members, perhaps balancing interests if or when those interests conflict, but nonetheless affirmatively seeking to protect specific interests in a way that none of the "quasi-judicial" officers should or may.

Flanagan was appointed monitor of Local 54 pursuant to a consent decree entered between the parties in *United States v. Hanley, et al.*, Civil No. 90–5017, a civil RICO action under 18 U.S.C. § 1964 seeking injunctive relief against various representatives of the

union. The consent decree was entered before the Hon. Garrett E. Brown, Jr., on April 12, 1991, and assigned to the monitor a variety of affirmative duties, the broad purpose of which was "the protection of members' rights and the assets of the Local and its benefit plans." Consent Decree, *United States v. Hanley, et al.,* April 12, 1991 ("Consent Decree"), ¶ 10. The monitor's authority included, as delineated in the consent decree: the internal investigation of Local 54; the appointment, discharge and reassignment of Local 54 personnel; the control of all disbursements; the filing of lawsuits; the review and termination of contracts; the review of all collective bargaining agreements and the processing of grievances; and any other "functions and duties as are customary for a court-appointed officer to perform in order to fulfill his or her duties as Monitor." Consent Decree, ¶ 12.

It is clear to this court that the duties and responsibilities of a court-appointed union monitor are distinguishable from those of any "quasi-judicial" officer in that, although the monitor has responsibilities to the court, and reports to the court, the monitor's purpose is to secure and promote the best interests of the union's members. Typical judicial and quasi-judicial officers function to apply rules, regulations, statutes and case law impartially, without the affirmative "mission" of promoting the best interests of a particular party or group, in this case, the membership of Local 54. The rationale which supports the general non-discoverability of a judicial or quasi-judicial officer's mental or deliberative processes, fails to support such a privilege with respect to Flanagan, as the monitor for Local 54.

Accordingly, the motion to continue Flanagan's deposition shall be granted in part and denied in part. The deposition of Flanagan, shall be continued to the extent that it seeks to inquire into the meaning and intent of his April 6, 1992 decision, rendered pursuant to the hearings held by him and commenced September 3, 1991, shall be granted; to the extent that it seeks testimony relating to his communications with attorneys Simonoff and O'Brien, it shall be denied.

## IV. Conclusions.

Accordingly, and for the reasons discussed in this opinion, and for good cause shown, the plaintiffs' motion for an order compelling discovery from and for the imposition of sanctions upon the defendant for failing to either produce witnesses for noticed depositions, or to seek a protective order preventing their attendance, shall be granted in part and denied in part.

The accompanying order shall be entered.